United States Court of Appeals
Fifth Circuit

**F I L E D**

January 27, 2006

Charles R. Fulbruge III
Clerk

**UNITED STATES COURT OF APPEALS
FIFTH CIRCUIT**

No. 04-70032

CATHY HENDERSON,

Petitioner-Appellant,

versus

DOUGLAS DRETKE, DIRECTOR, TEXAS DEPARTMENT OF CRIMINAL JUSTICE,
CORRECTIONAL INSTITUTIONS DIVISION,

Respondent-Appellee.

**Appeal from the United States District Court
for the Western District of Texas
(A-02-CA-758-SS)**

Before JONES, Chief Judge, and BARKSDALE and PRADO, Circuit Judges.

PER CURIAM:[*]

In 1995, Cathy Lynn Henderson was convicted in Texas state court of capital child murder, *see* TEX. PENAL CODE ANN. § 19.03(a)(8), and sentenced to death. After federal habeas relief was denied on all 13 claims, the district court granted a certificate of appealability (COA) for six of them, as well as a portion of another.

Henderson seeks a COA from this court for four of the remaining issues for which the district court denied a COA: (1)

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

whether her Fifth and Fourteenth Amendment rights were violated because her confession to an FBI Agent was involuntary and coerced; (2) whether, shortly after she was arrested for kidnapping the child she later confessed to killing, her Sixth Amendment confrontation and Fourteenth Amendment due process rights were violated by the trial court's denial of her request to be present at the hearing on the State's motion to compel the production of evidence needed for the grand jury proceeding; (3) whether her Sixth Amendment right to effective assistance of counsel was violated by her trial counsel; and (4) whether her Sixth Amendment confrontation and Fourteenth Amendment due process rights were violated by the trial court's post-trial findings of fact and conclusions of law regarding its pre-trial denial of Henderson's motion to suppress evidence.

For each of the four issues, a COA is **DENIED**. A subsequent opinion will address the numerous issues certified by the district court.

## I.

On the morning of 21 January 1994, the Baughs left their three-and-one-half month old son, Brandon (the child), with Henderson. Later that day, the child received massive head trauma, causing his death.

Soon thereafter, on 23 and 25 January, respectively, state and federal warrants were issued against Henderson for the felony

2

offense of kidnapping.  Approximately a week later, on 1 February, the FBI arrested Henderson in Kansas City, Missouri.

During her interrogation by FBI Agent Napier, Henderson initially denied knowledge of the child's whereabouts and stated she had left him with his grandmother; then, she offered to provide information about the child in exchange for an agreement that she remain in Missouri.  The Agent advised that he did not have authority to negotiate such an agreement but that those who did would need information on which to base their decision.  Henderson soon confessed to killing the child, claiming it was an accident, and to burying him in a wooded area near Waco, Texas.  When Agent Napier asked Henderson to draw a map to the burial site, she refused.  After the Agent reduced Henderson's comments to writing, she refused to sign the statement and requested a lawyer.

Later that day, Henderson met with Ronald Hall, an assistant federal public defender (AFPD) in Kansas City, and Ronald Ninemire, chief investigator for the federal public defender's office.  Concluding that he needed a Texas map to facilitate Henderson's cooperation with authorities' efforts to locate the child, AFPD Hall requested one from FBI Agent Hepperman.  Unsure of the reason for that request, the Agent did not assist AFPD Hall.  Accordingly, he obtained a map from Ninemire's office in another building and asked Henderson to draw a map to the burial site.  At some point, Henderson did so.

After his interview with Henderson, AFPD Hall met with several persons in law enforcement, including Carla Oppenheimer, an Assistant United States Attorney (AUSA), and Agent Hepperman. AFPD Hall opined that the child was dead. In addition, Agents testified at trial that: AFPD Hall told them Henderson had drawn a detailed map to the burial site; and Hall could find it using the map. AFPD Hall denies making these statements or ever giving the Agents any indication of any map's existence. In any event, Agent Hepperman and AUSA Oppenheimer formed the subjective belief that any map was made with the intent of aiding law enforcement.

The next day, 2 February, AFPD Hall faxed maps prepared by Henderson to Nona Byington, Henderson's counsel in Texas, where the case was being investigated by Travis County Sheriff Keel. Law enforcement officers, who had learned from AFPD Hall that he intended to send materials to Byington, contacted her and requested the maps. After Byington attempted unsuccessfully to negotiate a plea agreement in exchange for the maps, she refused to provide any in her possession. Because of her refusal, Sheriff Keel publicly accused Byington of being an accomplice in an ongoing crime. (Byington's subsequent defamation action against Sheriff Keel was settled.)

On 3 February, Texas lawyer Linda Icenhauer-Ramirez was appointed to represent Henderson on state kidnapping charges. That same day, a Travis County grand jury issued a subpoena *duces tecum*

4

for Byington to appear with any maps. She refused, claiming attorney-client privilege. An arrest warrant was issued for Byington, as well as a search warrant for her automobile and house. The arrest warrant was soon withdrawn. Authorities executed the search warrant but did not find any maps.

Earlier, on 2 February, Henderson (who waived extradition) had been returned to Texas. While in custody there, Henderson was placed in solitary confinement under "firewatch", a procedure whereby inmates monitor another inmate for safety reasons. During "firewatch", between 5 and 8 February, Henderson befriended inmate Bolivia Jackson. Jackson communicated with Henderson on numerous occasions (correspondence primarily and a few conversations). Jackson provided the correspondence to the correctional authorities, as well as recounting the conversations. In these communications, Henderson gave conflicting statements concerning the child's location. On the one hand, she told Jackson that she could draw a map to where the child was dropped off in Missouri; on the other, that the child was with his grandmother in Oklahoma.

On 7 February, after a grand jury issued another subpoena for any maps, the State moved to compel their production. Following a hearing on that motion (map hearing), at which Henderson's counsel, Linda Icenhauer-Ramirez and Nona Byington, as well as Byington's counsel, were present, *but Henderson was not*, the state court held: an attorney-client relationship existed between Henderson and

Byington; but, any maps were *not* privileged because they were made with the intent to aid law enforcement. Upon being ordered to produce any maps in her possession, Byington produced two. Using the maps, authorities found the burial site.

Henderson was charged on 9 February, and indicted on 22 April, for the capital murder of the child. During pre-trial hearings, which occurred over several months in 1994 and 1995, Henderson moved to suppress all evidence obtained from, *inter alia*, the use of the maps. The motion was denied. *Post-trial*, the court prepared findings of fact and conclusions of law concerning that denial, including: (1) Henderson "failed to meet [her] burden of proof at the [map] hearing ... [and was thus] precluded from attempting to suppress any evidence ... resulting from the production of the maps by the introduction of additional evidence which was available to [Henderson] at the time of the hearing on the motion to compel"; (2) the maps were intended to aid law enforcement in finding the child and were not intended to be confidential; (3) AFPD Hall did not violate the attorney-client privilege during his conversations with law enforcement; (4) the crime-fraud exception to that privilege applied because there was evidence of an ongoing kidnapping at the time of the map hearing; (5) even if law enforcement knew the child was dead, the crime-fraud exception still applied because of the ongoing crime of abuse of a corpse; (6) even if the maps were privileged, the fruit of the

6

poisonous tree doctrine did not compel suppression; and (7) Henderson was not denied effective assistance of counsel.

On 17 May 1995, Henderson was found guilty of the capital murder of a child under age six. After the jury found, *inter alia*, no mitigating factors to warrant a life sentence, Henderson was sentenced to death on 30 May 1995.

On direct appeal, the Texas Court of Criminal Appeals affirmed. ***Henderson v. State***, 962 S.W.2d 544, 563 (Tex. Crim. App. 1997) (en banc) (***Henderson I***). The Supreme Court of the United States denied a writ of certiorari. ***Henderson v. Texas***, 525 U.S. 978 (1998).

In seeking state habeas relief in 1998, Henderson raised 18 grounds. Without holding an evidentiary hearing, the state habeas court recommended relief being denied. In findings of fact and conclusions of law, the court found to be "true" the affidavits of Robert and Linda Icenhauer-Ramirez (Henderson's trial counsel), Keith Hampton (Henderson's counsel on direct appeal), Sheriff Keel (Travis County Sheriff who investigated the child's disappearance), and Robert Smith (an Assistant District Attorney who prosecuted Henderson's case). The Texas Court of Criminal Appeals summarily denied habeas relief. ***Ex parte Henderson***, No. 49984-01 (Tex. Crim. App. 6 Mar. 2002) (per curiam) (unpublished).

Henderson sought federal habeas relief, raising 13 grounds. ***Henderson v. Dretke***, No. A-02-CA-758-SS, slip op. at 6-8 (W.D. Tex.

7

31 Mar. 2004) (*Henderson II*). Relief was denied. The district court granted Henderson a COA for six of the issues, as well as part of another: (1) whether Henderson's Sixth Amendment rights where violated when state law enforcement officials' tactics undermined the confidentiality of Henderson's communications with her attorney; and (2)-(7) whether Henderson's Sixth Amendment right to effective assistance of counsel was violated: (2) when AFPD Hall revealed to law enforcement that Henderson had drawn the map; (3) because Henderson's initial Texas counsel, Byington, also told law enforcement officials that Henderson had drawn the map; (4) when Steve Brittain (Nona Byington's attorney at the map hearing) failed to adequately protect Henderson's rights when he attempted to plea-bargain on Henderson's behalf; (5) when, at the map hearing, Linda Icenhauer-Ramirez, appointed trial counsel, did not adequately help prevent disclosure of the maps (this is the portion of the IAC claim concerning Linda Icenhauer-Ramirez for which a COA was granted; it was denied concerning trial); (6) because her appellate counsel, Keith Hampton, provided constitutionally inadequate assistance; and (7) when the police placed her under "firewatch" to obtain incriminating statements, in violation of *Massiah v. United States*, 377 U.S. 201, 206 (1964) (holding that "the petitioner was denied the basic protections of [the Sixth Amendment] guarantee when there was used against him at his trial evidence of his own incriminating words, which federal agents had

deliberately elicited from him after he had been indicted and in the absence of his counsel"). A COA was denied for all other claims. *Henderson v. Dretke*, No. A-02-CA-758-SS (W.D. Tex. 15 July 2004) (unpublished order) (*Henderson III*).

## II.

Henderson seeks a COA here. Her 28 U.S.C. § 2254 habeas petition is subject to the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214 (1996) (AEDPA). *See*, *e.g.*, *Lindh v. Murphy*, 521 U.S. 320, 336 (1997). Under AEDPA, she must first obtain a COA from either the district, or our, court before she can appeal the denial of a federal habeas claim. 28 U.S.C. § 2253(c) (2000); FED. R. APP. P. 22(b)(1); *Slack v. McDaniel*, 529 U.S. 473, 478 (2000). Federal Rule of Appellate Procedure 22(b)(1) requires that the district court first decide whether to grant the COA. Henderson filed a notice of appeal and request for a COA in district court. As discussed, it granted a COA for six issues and part of another and denied it for the others, including those addressed *infra*.

Henderson seeks a COA for four of the issues the district court refused to certify for appeal. (Henderson's COA request included a fifth issue: whether the "firewatch" violated *Massiah*. As Henderson recognized, but only *after* the State noted this erroneous COA request here, and as described above, the district court granted a COA for that issue. *Henderson III*, slip op. at 5.

9

Therefore, we do *not* address it.  Instead, it will be addressed in our subsequent opinion concerning the issues certified for appeal by the district court.  On the other hand, this erroneous request is in line with other errors and shortcomings in the COA request to our court, discussed *infra*.)

Therefore, at issue are the COA requests for the following claims:  (1) Henderson's Fifth and Fourteenth Amendment rights were violated because her statement to FBI Agent Napier in Missouri was involuntary and coerced;  (2) Henderson's Sixth Amendment confrontation and Fourteenth Amendment due process rights were violated when the trial court refused to allow Henderson to be present at the map hearing; (3) Henderson's Sixth Amendment right to effective assistance of counsel was violated by her trial counsel, Linda and Robert Icenhauer-Ramirez; and (4) Henderson's Sixth Amendment confrontation and Fourteenth Amendment due process rights were violated by the trial court's post-trial findings of fact and conclusions of law concerning its pre-trial denial of her suppression motion.

To obtain a COA, Henderson must "ma[k]e a substantial showing of the denial of a constitutional right".  28 U.S.C. § 2253(c)(2); *see* **Miller-El v. Cockrell**, 537 U.S. 322, 336 (2003).  Restated, she must demonstrate "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to

deserve encouragement to proceed further". *Miller-El*, 537 U.S. at 336 (quoting *Slack*, 529 U.S. at 484) (internal quotation marks omitted). "This threshold inquiry does not require full consideration of the factual or legal bases adduced in support of the claims." *Id*. Instead, it "requires an overview of the claims in the habeas petition and a general assessment of their merits". *Id.* This being a death-penalty case, all doubts regarding "whether a COA should issue must be resolved in [Henderson's] favor". *Hernandez v. Johnson*, 213 F.3d 243, 248 (5th Cir.), *cert. denied*, 531 U.S. 966 (2000).

Of course, for making this required threshold inquiry, we must be mindful of AEDPA's standards for merits-rulings. Under AEDPA, for deciding a claim, a federal court must defer to the state court's resolution of that claim concerning questions of law and mixed questions of law and fact, unless that "decision ... was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court". 28 U.S.C. § 2254(d)(1); *see Hill v. Johnson*, 210 F.3d 481, 488 (5th Cir. 2000), *cert. denied*, 532 U.S. 1039 (2001). "A state court's decision is ... contrary to clearly established federal law if it reaches a legal conclusion in direct conflict with a prior decision of the Supreme Court or if it reaches a different conclusion than the Supreme Court based on materially indistinguishable facts."

11

*Miniel v. Cockrell*, 339 F.3d 331, 337 (5th Cir. 2003), *cert. denied*, 540 U.S. 1179 (2004).

Similarly, in deciding a claim pursuant to AEDPA, a federal court must defer to the state court's factual findings unless they "resulted in a decision that was based on an unreasonable determination of the facts in [the] light of the evidence presented in the State court proceeding". 28 U.S.C. § 2254(d)(2). These findings are entitled to a presumption of correctness, which can be rebutted only by "clear and convincing evidence". *Id.* § 2254(e)(1).

Throughout her COA application here, which is often difficult to decipher, Henderson attempts to *incorporate* additional materials. Under both Federal Rule of Appellate Procedure 28(a)(9)(A) and local rules 28.2.3 and 28.3(j), Henderson may not do so. Therefore, they will *not* be considered as part of Henderson's COA application here.

## A.

First, Henderson contends she is entitled to a COA because reasonable jurists could debate whether FBI Agent Napier violated her Fifth and Fourteenth Amendment rights by causing an involuntary and coerced confession. Henderson raised this issue on direct appeal.

12

During her interrogation by Agent Napier, Henderson confessed to killing and burying the child. The Texas Court of Criminal Appeals described this interrogation as follows:

> Early in the interview, Agent Napier told [Henderson] that she was at a crossroads, that she could determine which path to take, and that she could tell her story or let the justice system take its course. Later in the interview, [Henderson] offered to tell everything she knew in exchange for staying in Missouri. In response, Napier asked questions such as: "What do you mean?" "What's everything?" *Napier never promised appellant that she could stay in Missouri, and in fact, told her that he was not in a position to make any bargains, deals, or promises.* He also told her that the people in a position to make a deal would want to have a basis for making their decision. Later, through leading questions, Napier elicited from [Henderson] a confession that she killed the baby. He asked [Henderson], "When you say the whole thing, are you talking about that Brandon is dead, that you know where the body's located, that it was an accident, that you're sorry?" [Henderson] responded by nodding her head. Later Napier stated, "Brandon's dead. It was an accident." To this statement, [Henderson] replied, "Yes." Napier asked, "Did you bury him[?]" [Henderson] responded, "Of course, I did. He's just a baby." Subsequent interrogation led to [Henderson's] statement that she had buried Brandon in a wooded area near Waco. At that point, Napier asked [Henderson] to draw a map so that the authorities could find Brandon. Napier talked about Brandon's parents and talked about their need to "put closure" on this episode. [Henderson], however, refused to draw a map.

*Henderson I*, 962 S.W.2d at 563-64 (emphasis added).

Applying AEDPA's presumption of correctness, the district court adopted the Texas Court of Criminal Appeals' rulings on

13

direct appeal that: Agent Napier made no promises to, or deals with, Henderson in exchange for her statement; and she confessed *before* Agent Napier discussed the parents' need for closure. Henderson claims her confession to Agent Napier was involuntary and coerced because: (1) she was led to believe that cooperation with the FBI would lead to a deal; and (2) Agent Napier's having discussed the child's parents' need for closure and help in recovering the child's body, Henderson's resulting confession was not an act of free will.

Henderson fails, however, to provide any record support, much less the clear and convincing evidence as mandated by AEDPA, for her contentions. 28 U.S.C. § 2254(e)(1). Jurists of reason would *not* disagree that the issue of whether Henderson's confession was involuntary and coerced is *not* "adequate to deserve encouragement to proceed further". ***Miller v. Dretke***, 404 F.3d 908, 913 (5th Cir. 2005) (citing ***Miller-El***, 537 U.S. at 336).

B.

Henderson next seeks a COA on whether her Sixth Amendment confrontation and Fourteenth Amendment due process rights were violated because: the trial judge denied her request to be present at the 7 February 1994 map hearing; her rights were not adequately protected at that hearing; and Henderson's then-counsel, Byington, was compelled to produce the maps, which were then used to find the child's burial site.

14

Henderson's unsupported allegations contrast with Linda Icenhauer-Ramirez's state habeas affidavit, which was found "true". (Henderson's failed attack on the affidavit is discussed in part II.C., concerning her ineffective assistance of counsel claims.) That affidavit maintains Henderson was adequately represented at the map hearing. Although Henderson emphasizes that Linda Icenhauer-Ramirez did not meet with Byington's counsel on the day of the map hearing, or have any discussions with Byington's counsel during that hearing, Ms. Icenhauer-Ramirez's affidavit stated:

> [Henderson]'s attorney seems to be asserting that Cathy Henderson's rights were not protected during the [map hearing]. It was clear to everyone at the time and should be clear to [Henderson]'s attorney now that Nona Byington was still one of Cathy Henderson's attorneys at the time of the [map hearing]. Nona Byington fully represented her client and protected her interests during that hearing. Cathy Henderson was in no way hurt by the actions of any of her attorneys during that time.

Because Henderson did *not* raise these claims on *direct appeal*, the state habeas court held they were procedurally defaulted. *See Ex parte Townsend*, 137 S.W.3d 79, 81 (Tex. Crim. App. 2004) ("Because the applicant did not raise the issue on direct appeal, the applicant has forfeited his claim [on habeas review].").

"The procedural-default doctrine precludes federal habeas review when the last reasoned state-court opinion addressing a claim explicitly rejects it on a state procedural ground." *Matchett v. Dretke*, 380 F.3d 844, 848 (5th Cir. 2004). "Where, as

15

here, a state court clearly and expressly states that its judgment rests on a state procedural bar, a presumption arises that the state court decision rests on independent and adequate state law grounds." *Pitts v. Anderson*, 122 F.3d 275, 279 (5th Cir. 1997).

> The procedural default doctrine, resting on our confinement to review of federal questions, precludes federal habeas review when the last reasoned state court opinion addressing a claim explicitly rejects it on a state procedural ground.... The doctrine presumes that a state procedural ground is adequate and independent — the rule must, for instance, be regularly followed — and, ordinarily, the *burden is on the habeas petitioner to demonstrate otherwise*.

*Hughes v. Johnson*, 191 F.3d 607, 614 (5th Cir. 1999) (emphasis added), *cert. denied*, 528 U.S. 1145 (2000).

If the state court relies on an adequate and independent state procedural rule, then federal habeas review is barred unless the petitioner can show either (1) cause and prejudice or (2) that not addressing the claim will result in a fundamental miscarriage of justice. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991); *Smith v. Johnson*, 216 F.3d 521, 523-24 (5th Cir. 2000).

Although the district court noted the procedural default holding by the state habeas court, it addressed instead alternative holdings by that court:  Henderson did not have a right to be present at the map hearing; and even if she did, her absence was harmless error because she addressed the subject of that hearing in

16

her subsequent suppression motion hearings.  The district court held:

> It is far from clear that Henderson's absence from the February 7, 1994 [map] hearing in any way implicated her right to confrontation guaranteed under the Sixth and Fourteenth Amendments, considering: (1) the hearing took place before trial commenced and during the grand jury investigation; (2) the attorneys who represented Byington at the [map] hearing vigorously defended that the map was protected by attorney-client privilege and cross-examined the State's witnesses; and (3) Henderson later had a chance to cross-examine the witnesses and present evidence in support of her position during the pre-trial hearings on her motions to suppress the map.  At the very least, the Court cannot hold the state habeas court *unreasonably* applied clearly established federal law in concluding Henderson did not have a right to be at the map hearing.

*Henderson II*, slip op. at 33-34 (internal footnote and citations omitted).  In the alternative, the district court held the state habeas court's holding that any error was harmless was not unreasonable in the light of the "extensive hearings" on the suppression motion.  *Id.* at 34.

Henderson has *not* demonstrated she is entitled to a COA on this issue.  In the light of the district court's holdings, she has failed to demonstrate that reasonable jurists would debate whether these claims should have been resolved by the district court in a different manner or that they deserve to proceed further.

C.

17

Henderson claims she is entitled to a COA on whether she received ineffective assistance of counsel (IAC) from trial counsel Linda and Robert Icenhauer-Ramirez. (Byington, who represented Henderson concerning the map production, ended her representation *prior to trial*.) Henderson's appointed lead trial counsel was Linda Icenhauer-Ramirez, who requested that her then-husband, Robert Icenhauer-Ramirez, be appointed co-counsel. Ms. Icenhauer-Ramirez remained lead counsel throughout trial. Mr. Icenhauer-Ramirez withdrew and was replaced. (Henderson has not asserted IAC against the replacement. Henderson was appointed new counsel, Keith Hampton, for her direct appeal.)

In deciding whether to grant a COA on any of Henderson's five IAC claims, our required threshold inquiry must include an overview of the well-established two-prong test for those claims. On the merits, Henderson was required to show: (1) counsel's representation fell below professional norms (deficient-performance prong); *and* (2) a reasonable probability exists that, but for that deficiency, the trial's result would have been different (prejudice prong). *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

Under the first prong, counsel "has [the] duty to bring to bear such skill and knowledge as will render the trial a reliable adversarial" proceeding. *Id.* at 688. The proper standard is "simply reasonableness under prevailing professional norms". *Id.* In making this determination, the totality of the circumstances are

18

considered.  On the other hand, "[j]udicial scrutiny of counsel's performance must be highly deferential".  *Id.* at 689.

Under the second prong, at issue is whether there is a reasonable probability that counsel's deficient performance rendered the proceeding's result unreliable and, therefore, unfair. *Id.* at 694.  This requires a showing that counsel's performance "actually had an adverse effect on the defense".  *Id.* at 693.

Again, for COA purposes, we do not fully consider the merits of Henderson's IAC claims.  Instead, we decide only whether "reasonable jurists could debate whether ... [Henderson's claims] should have been resolved in a different manner or that [they] were adequate to deserve encouragement to proceed further".  *Miller-El*, 537 U.S. at 336 (quoting *Slack*, 529 U.S. at 484) (internal quotation marks omitted).  In deciding this COA issue, we must assume the last state habeas court (Texas Court of Criminal Appeals) applied *Strickland*'s two-prong analysis, even though the decision was rendered without a written opinion.  *Henderson II*, slip. op. at 19 (citing *Catalan v. Cockrell*, 315 F.3d 491, 493 (5th Cir. 2002)).  (As noted, the state habeas trial court entered findings and conclusions, including the conclusion that Henderson's trial counsel did *not* provide constitutionally ineffective assistance, although it did not discuss the two-prong analysis in its findings and conclusions.)

19

As a preliminary matter, Henderson contends that, even though the state habeas court found them "true", the affidavits of Robert and Linda Icenhauer-Ramirez (trial counsel), Keith Hampton (appellate counsel), Sheriff Keel, and Assistant District Attorney Robert Smith (prosecutor) should not be entitled to the 28 U.S.C. § 2254(e)(1) presumption of correctness. Henderson neither challenged these affidavits after the State presented them with its reply to Henderson's state habeas petition, nor did she challenge them on federal habeas review in district court (either in her habeas petition or in her response to the State's summary judgment motion). Not until her COA request to the district court did Henderson challenge the "truth" of the affidavits. Needless to say, this was far too late; we will not consider Henderson's challenge to those affidavits. (Along this line, Henderson contends in her COA request here that she should have been granted an evidentiary hearing in district court to resolve asserted factual disputes in those affidavits. The record does *not* reflect, however, that in district court Henderson *ever* requested, or was denied, an evidentiary hearing.)

We note that, even if Henderson had preserved this challenge, in order to rebut a state habeas court's factual findings, she must present, on the merits, "clear and convincing" evidence to the contrary. *See* 28 U.S.C. § 2254(e)(1). Instead, Henderson only briefs whether the affidavits of Robert and Linda Icenhauer-Ramirez

20

and Sheriff Keel are "clearly erroneous". (Only against Linda Icenhauer-Ramirez does she even raise any arguably substantive claims; against Robert Icenhauer-Ramirez and Sheriff Keel, Henderson makes personal attacks, which lack *any* record support.) Moreover, any contentions she may have had regarding Hampton's and Smith's affidavits are waived because of Henderson's failure to discuss them in her COA application, either to the district, or our, court.

Henderson claims she is entitled to a COA because trial counsel Linda and Robert Icenhauer-Ramirez were ineffective in five respects. None of the claims satisfies the standard for a COA.

1.

Henderson first asserts a COA should issue for her contention that Linda Icenhauer-Ramirez failed to pursue claims that law enforcement eavesdropped on the "red room" while Henderson was originally detained in Missouri. (This alleged conduct was apparently in order to determine that Henderson had prepared the map(s).) That room was where Henderson was originally interviewed in Missouri by AFPD Hall and investigator Ninemire. According to Henderson, Ms. Icenhauer-Ramirez stated that Henderson was eavesdropped upon in that room. In support, Henderson references a private investigator's affidavit that Ms. Icenhauer-Ramirez told him this was her *belief*. Henderson does *not* cite to Ms. Icenhauer-Ramirez's treatment of this issue at trial or her state habeas

21

affidavit where she discusses her investigation of the possible eavesdropping.

Even assuming as true the statement attributed to Ms. Icenhauer-Ramirez, Henderson is not entitled to a COA for this issue because reasonable jurists would *not* debate whether the district court correctly resolved this issue against Henderson. In her state habeas affidavit, Ms. Icenhauer-Ramirez stated:

> I traveled to Kansas City prior to the pretrial hearings and prior to Dayna Blazey's and Robert Smith's [Texas Assistant District Attorneys assigned to Henderson's case] trip to Kansas City. I spent several hours with [AFPD] Hall and Ron Ninemire at their office. They were very open about their involvement in the case and they even took me across the street to the Federal Courthouse and showed me the "red room"; the hallway where Ron Hall talked to the FBI agents, the assistant U.S. attorney, and the two Travis County deputies; and the adjacent courtroom. As a result of that visit, I was familiar with the "red room" and the potential that someone might have eavesdropped on the[ir] conversation [with Henderson on 1 February 1994]. Unfortunately, the information given to me by Hall and Ninemire did not bear that possibility out. It was clear after my trip to Kansas City that it was through Ron Hall's actions of requesting a map from the FBI and from his conversations with the FBI agents and assistant U.S. attorney in the hallway outside the courtroom that the authorities knew of the existence of the map drawn by [Henderson].

As discussed *supra*, this affidavit is entitled to the AEDPA presumption of correctness. Pursuant to this presumption, Ms. Icenhauer-Ramirez *did* investigate the possibility that law enforcement learned of a map's existence by eavesdropping on the

22

"red room" and concluded to the contrary. Counsel is not ineffective for failing to pursue a claim that is unsupported by law or evidence. *See*, *e.g.*, **Hernandez v. Johnson**, 108 F.3d 554, 564 (5th Cir.), *cert. denied*, 522 U.S. 984 (1997). In short, jurists of reason would *not* debate the district court's conclusion that, in this regard, Ms. Icenhauer-Ramirez's representation was *not* deficient. **Henderson II**, slip op. at 23.

### 2.

Henderson next asserts reasonable jurists would debate whether her trial attorneys were ineffective for failing to investigate, and challenge, Henderson's communications with Jackson, a fellow inmate at the Travis County Jail, whom Henderson claimed was an agent of the State. As discussed, Jackson was assigned to "firewatch" duty, through which one inmate monitors another; while monitoring Henderson, Jackson exchanged correspondence with, and spoke to, her; and Jackson provided to law enforcement, *inter alia*, letters written by Henderson, which gave conflicting accounts of the child's location.

### a.

This information was critical evidence at the motion to suppress hearing. The defense strategy was to show: when it sought production of the maps, law enforcement was both subjectively and objectively aware that the child was dead; and if this were so, the crime-fraud exception to the attorney-client

privilege would not apply because there was no ongoing criminal offense. *See* TEX. R. EVID. 503(d)(1). Obviously, any evidence suggesting the child may have still been alive would be detrimental to this strategy.

Ms. Icenhauer-Ramirez objected immediately to the firewatch correspondence, contending that Jackson was acting as an agent for the State; and her requested recess was granted. Upon resumption of the hearing, she informed the court she was unable to proceed without further investigation into Jackson's communications (of which she had learned only the previous day, during a detective's pre-trial hearing testimony), and the circumstances under which they were made. The court recessed hearing this issue for approximately one month.

In her state habeas affidavit, Ms. Icenhauer-Ramirez stated: she then contacted Jackson, who told Ms. Icenhauer-Ramirez she was *not* acting as an agent for law enforcement at the time she communicated with Henderson. After meeting with Jackson, Henderson's counsel moved to suppress all statements Henderson made to Jackson. (Counsel later abandoned the motion because Elvira Eller failed to provide tapes, discussed *infra*, which allegedly contained statements by Sheriff Keel demonstrating that he knew the child was dead.)

The record belies the claim that Ms. Icenhauer-Ramirez failed to adequately investigate the "firewatch" communications.

24

Therefore, jurists of reason would *not* debate the district court's ruling that "[t]he state habeas court thus did not apply **Strickland** unreasonably when [it] concluded Icenhauer-Ramirez had provided effective assistance". **Henderson II**, slip. op. at 24.

### b.

To the extent Henderson claims the "firewatch" communications *per se* violated her Sixth Amendment right to counsel, the district court held: because, when the communications occurred, Henderson had not yet been charged with capital child murder, such rights had not then attached for that offense. *See* **Texas v. Cobb**, 532 U.S. 162, 168 (2001) (holding the Sixth Amendment right to counsel attaches only after being formally charged with a specific offense). Nevertheless, the district court granted Henderson a COA for this claim, noting the "harsh" nature of the **Cobb** rule and expressing concern that, because, when the communications occurred, Henderson had already been "charged with kidnap[p]ing the same child she was eventually charged with murdering, there seems significant danger of gamesmanship by authorities". *See* **Henderson III**, slip op. at 5. Therefore, we need *not* consider this subissue for COA purposes.

### c.

In regard to Henderson's claim that a COA should issue because Linda Icenhauer-Ramirez was ineffective for abandoning the motion to suppress, a lawyer cannot be ineffective for failing to pursue

25

futile motions. *See*, *e.g.*, **Koch v. Puckett**, 907 F.2d 524, 527 (5th Cir. 1990). Jurists of reason would *not* debate the district court's conclusion that the state habeas court concluded correctly that this issue would *not* be resolved in Henderson's favor.

3.

Henderson asserts that a COA should issue because her trial counsel failed to obtain a ruling on Henderson's pre-trial motion to suppress any maps created by Henderson. Identifying the specific claim Henderson raises requires detailing the progression of this claim on federal habeas. In her petition, Henderson claimed that the Icenhauer-Ramirezes, in their motion to suppress, failed to use an "*ex parte* deposition" (presumably of AFPD Hall and/or investigator Ninemire) that would demonstrate that, but for the actions of Hall, Ninemire, and Byington, "law enforcement authorities would never have learned of the existence of a map indicating the location of the child's body". In ruling, the district court stated it did not believe Henderson was prejudiced by the Icenhauer-Ramirezes' failure to use the deposition, concluding "it is unlikely the deposition testimony would have changed the result". **Henderson II**, slip op. at 22.

In her COA request in district court, in challenging her representation at the suppression motion, Henderson took a different approach. She contested Linda Icenhauer-Ramirez's contention that she could fully litigate the suppression issue at

26

trial; Henderson asserted that the suppression "motion was never ruled on, and the State's collateral estoppel motion precluding relitigation was granted by the trial court".  Improperly seeking to incorporate other materials, Henderson accused trial counsel of "arbitrarily unreasonably [choosing] to disbelieve evidence which could have helped their client".  The district court appears *not* to have addressed this claim, which was presented out of order and in a nonsensical fashion.  Instead, with regard to Henderson's trial counsel, the district court granted a COA concerning *only* Ms. Icenhauer-Ramirez for her "ineffective assistance ... regarding the map only".  **Henderson III,** slip op. at 5.  It denied a COA for the IAC claim concerning Linda and Robert Icenhauer-Ramirez's representation at trial.

In our court, Henderson's COA application challenged Linda Icenhauer-Ramirez's failure to obtain a ruling on her suppression motion.  In stating that "the suppression motion only challenged the actions of the Missouri attorney [AFPD Hall] and did not address the action or inaction of any counsel at the map hearing", Henderson appears to conflate the pre-trial suppression motion with the earlier map hearing.  We are puzzled, to say the least, by Henderson's assertion that Ms. Icenhauer-Ramirez failed to obtain a ruling on her suppression motion; *it was denied during pre-trial hearings*.

27

In the light of the progression of this claim through federal habeas, we conclude that the specific claim presented to our court — which reveals a lack of understanding of the pre-trial motions in this case — *was not raised until Henderson's COA request to the district court*. Because it was *not* timely raised, we will *not* consider it.

In the alternative, we conclude that reasonable jurists would *not* disagree with the district court's conclusion that Ms. Icenhauer-Ramirez's representation was *not*, in this regard, unreasonable; had the suppression motion been conducted differently, the motion's result would likely have been the same.

4.

Henderson next contends a COA should issue for whether her trial attorneys were ineffective for providing to the prosecution information provided by Elvira Eller, who had a personal relationship with Sheriff Keel during the pre-trial period of Henderson's proceedings. Eller contacted Henderson's attorneys, informed them of that relationship, and claimed she possessed tapes proving the Sheriff knew the child was dead when the State was seeking production of the maps. Eller, however, never produced any tapes supporting that claim. Ms. Icenhauer-Ramirez eventually notified the prosecution about Eller and disclosed the communications and tapes Eller had provided to defense counsel.

Henderson contends Ms. Icenhauer-Ramirez was ineffective in doing so, because her actions resulted in no advantage to Henderson and only helped the prosecution by putting it on notice that Sheriff Keel might present character issues harmful to the State's case. In a 1998 deposition with Henderson's appellate counsel, Ms. Icenhauer-Ramirez stated she felt that, if a tape did exist, it was critical, material evidence and "we felt like we had an obligation to inform the DA's office of that".

Henderson offers nothing, other than conclusory statements, in support of her claim that Ms. Icenhauer-Ramirez's providing this information to the prosecution was unreasonable. Ms. Icenhauer-Ramirez's state habeas affidavit stated:

> None of the [audio] tapes which Ms. Eller delivered to us had anything to do with the Cathy Henderson case. They contain[ed] [communications detailing the personal relationship] between Ms. Eller and [Sheriff] Keel. Although Ms. Eller asserted to us back in 1995, that she had a recording of [Sheriff] Keel saying that he knew Brandon Baugh was dead during the time [Sheriff] Keel was hounding Nona Byington, despite exhaustive attempts on our part, Ms. Eller never produced such a tape recording.

As discussed *supra*, this affidavit is entitled to the AEDPA presumption of correctness. None of the materials provided to the prosecution had any bearing on Henderson's case, and "exhaustive attempts" were made to procure the allegedly taped conversation in which Sheriff Keel allegedly stated he knew the child was dead. Therefore, reasonable jurists would *not* disagree with the district

29

court's conclusion that, in this regard, Ms. Icenhauer-Ramirez's representation was *not* deficient.

5.

In her final IAC COA request, Henderson contends that a COA should issue for whether Linda Icenhauer-Ramirez was ineffective for failing to object to the following jury instruction: "A person is criminally responsible if the result would not have occurred but for her conduct". *See* TEX. PENAL CODE ANN. § 6.04 (Vernon 1994). Henderson maintains that, for capital murder, the defendant must intend the *result* as opposed to the *conduct*. *See **Medina v. State***, 7 S.W.3d 633, 639 (Tex. Crim. App. 1999), *cert. denied*, 529 U.S. 1102 (2000).

The jury was also instructed, however, that it was required to find "beyond a reasonable doubt that ... Henderson ... *knowingly or intentionally* cause[d] the death of an individual ... under six years of age ...." (Emphasis added.) This language closely tracks the Texas murder statute. *See* TEX. PENAL CODE ANN. § 19.02(b)(1) (Vernon 1994) (stating that an offense is committed by "intentionally or knowingly caus[ing] the death of an individual"). Because this instruction was proper, reasonable jurists would *not* disagree with the district court's conclusion that: any objection by Ms. Icenhauer-Ramirez would have been futile; therefore, her not objecting was reasonable; and, in this regard, her performance was

30

not deficient.  *See*, *e.g.*, **Clark v. Collins**, 19 F.3d 959, 966 (5th Cir.), *cert. denied*, 512 U.S. 1284 (1994).

In sum, the district court's rulings on the reasonableness of trial counsel's challenged conduct are *not* debatable among jurists of reason on whether they constituted deficient performance (first prong).  Accordingly, for COA purposes, it is unnecessary to consider whether jurists of reason would debate whether any of the actions by trial counsel prejudiced Henderson (second prong).  *See* **Strickland**, 466 U.S. at 687 ("Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.").

### D.

Henderson's final COA request concerns whether her Sixth Amendment confrontation and Fourteenth Amendment due process rights were violated by the trial court's post-trial findings of fact and conclusions of law concerning her pre-trial motion to suppress, which was denied before trial.  Henderson characterizes these findings and conclusions as "*ex parte*".

### 1.

The district court declined to address Henderson's Sixth Amendment confrontation claim for this issue because it was inadequately briefed.  *See* **Henderson II**, slip op. at 30 n.13.  We agree with that conclusion and, therefore, will not address this

claim. *See*, *e.g.*, **Trevino v. Johnson**, 168 F.3d 173, 181 n.3 (5th Cir.) (stating that inadequately argued claims in a habeas petition are deemed waived), *cert. denied*, 527 U.S. 1056 (1999).

2.

Concerning Henderson's COA request for a claimed violation of her due process rights, she contends the trial court erred by issuing findings and conclusions drafted post-trial by the prosecution and denied her due process by not allowing her to relitigate issues from the map suppression hearing at trial.

Generic due process violations exist only where the trial court commits an error that renders the proceeding fundamentally unfair. **Styron v. Johnson**, 262 F.3d 438, 454 (5th Cir. 2001). An error makes a proceeding "fundamentally unfair [where] there is a reasonable probability that the verdict might have been different had the trial been properly conducted". **Id.** (quoting **Rogers v. Lynaugh**, 848 F.2d 606, 609 (5th Cir. 1988)).

a.

Henderson notes the findings and conclusions were entered over 40 days *after* she was sentenced, as well as after the court denied her new-trial motion. Henderson was found guilty and sentenced in May 1995; the findings and conclusions were filed that July. The motion to suppress upon which these findings and conclusions were based, however, was denied during Henderson's pre-trial hearings. Henderson claims this demonstrates the findings and conclusions

32

were drafted to assist Sheriff Keel in his then-pending civil action with Nona Byington, yet she fails to provide any citation to the record to support this arguably off-the-wall assertion. (As noted, Byington's defamation action against Sheriff Keel was settled.) No reliable evidence has been presented, however, to suggest the findings and conclusions were delayed for an improper purpose.

In his state habeas affidavit, prosecutor Robert Smith stated that he provided the proposed findings and conclusions only as suggestions. Moreover, he denied they were drafted in order to aid anyone in an unrelated civil suit. As discussed *supra*, this affidavit was found "true" by the state habeas court and is presumed correct under AEDPA. As also discussed *supra*, Henderson fails to even discuss this affidavit, much less offer the requisite clear and convincing evidence to rebut this presumption. In the light of Smith's affidavit, Henderson fails to show jurists of reason would disagree with the district court that "it is hard to see how the judge's admittedly late entry of the findings of fact and conclusions of law impacted the outcome of her case or even his decision of how to rule on that particular motion to suppress". **Henderson II**, slip. op. at 31.

b.

Finally, Henderson claims her due process rights were denied when, at trial, she was not allowed to relitigate issues from the

33

map suppression hearing. She asserts that the "State's motion precluding relitigation of those issues at trial was granted for the first time in an *ex parte* set of findings, entered after trial, that were never served on trial counsel". Needless to say, this is yet another puzzling claim; again, Henderson's suppression motion was denied during her pre-trial hearings. We need *not* address this claim because Henderson did not adequately address it in her COA request to the district court.

                                III.

For the foregoing reasons, a COA is ***DENIED*** for each of Henderson's four COA requests. A subsequent opinion will address the claims for which the district court granted a COA.

                                                    ***COA DENIED***