United States Court of Appeals
Fifth Circuit

**F I L E D**

August 11, 2006

Charles R. Fulbruge III
Clerk

**UNITED STATES COURT OF APPEALS
FIFTH CIRCUIT**

No. 04-70032

CATHY HENDERSON,

Petitioner-Appellant,

versus

NATHANIEL QUARTERMAN, DIRECTOR, TEXAS DEPARTMENT OF CRIMINAL
JUSTICE, CORRECTIONAL INSTITUTIONS DIVISION,

Respondent-Appellee.

Appeal from the United States District Court
for the Western District of Texas
(A-02-CA-758-SS)

Before JONES, Chief Judge, and BARKSDALE and PRADO, Circuit Judges.

RHESA HAWKINS BARKSDALE, Circuit Judge:

Cathy Henderson, convicted in 1995 of capital murder of a child under age six (capital child murder), in violation of TEX. PENAL CODE ANN. § 19.03(a)(8), and sentenced to death, seeks habeas relief from our court pursuant to issues for which the district court granted her a certificate of appealability (COA). (Recently, our court denied her COA request on additional issues. *Henderson v. Dretke*, 164 F. App'x 506 (5th Cir. 2006).)

Henderson was not charged with capital child murder for more than two weeks after being charged with kidnapping the child. Primarily at issue is whether, for events that occurred between the two charges, she can assert Sixth Amendment claims regarding the

murder charge.  The district court certified for appeal the claims related to this issue because of the possible unfairness of those claims being precluded by **Texas v. Cobb**, 532 U.S. 162, 167-68 (2001) (holding an accused's Sixth Amendment right to counsel does not attach to uncharged crimes "factually related" to the crime for which the defendant has been charged).  **AFFIRMED.**

## I.

On the morning of 21 January 1994, parents left their three-and-one-half month old son (the child) with Henderson.  Later that day, the child sustained massive head trauma, causing his death.

Soon thereafter, on 23 and 25 January, respectively, state and federal warrants were issued against Henderson for the felony offense of kidnapping.  Approximately one week later, on 1 February, the FBI arrested Henderson in Kansas City, Missouri.

During her interrogation by an FBI Agent, Henderson initially denied knowledge of the child's whereabouts and stated she had left him with his grandmother; she soon confessed, however, to killing the child (but claimed it was an accident) and to burying him in a wooded area near Waco, Texas.  Nevertheless, when the FBI Agent asked Henderson to draw a map to the burial site, she refused; and, after the Agent reduced Henderson's comments to writing, she refused to sign the statement and requested a lawyer.

Later that day, Henderson met with an assistant federal public defender (the AFPD) in Kansas City and that office's chief

investigator (FPD investigator). Concluding that he needed a Texas map to facilitate Henderson's cooperation with authorities' efforts to locate the child, the AFPD requested one from a second FBI Agent. This second FBI Agent had observed, through a one-way mirror, Henderson's interrogation by the other FBI Agent. Unsure of the reason for that request, the second FBI Agent did not assist the AFPD. Accordingly, the AFPD obtained a map from the FPD investigator's office in another building and asked Henderson to draw a map to the burial site. Henderson did so no later than the next day, 2 February.

After his interview with Henderson, the AFPD met with several persons in law enforcement, including an Assistant United States Attorney (AUSA) and the second FBI Agent. The AFPD opined that the child was dead. In addition, state and federal law-enforcement personnel testified at trial that: the AFPD told them Henderson had drawn a detailed map to the burial site (the map or maps); and the AFPD could find that site using the map. The AFPD denies making those statements or ever giving the agents any indication of any map's existence. In any event, the second FBI Agent and the AUSA formed the subjective belief that any map was made with the intent of aiding law enforcement.

On 2 February, the AFPD faxed maps prepared by Henderson to Nona Byington, Henderson's counsel in Texas, where the case was being investigated by Travis County Sheriff Keel. State law-enforcement officers, who had learned from the AFPD that he

intended to send materials to Byington, contacted her and requested the maps. After Byington attempted unsuccessfully to negotiate a plea agreement in exchange for the maps, she refused to provide any in her possession.

On 3 February, Texas lawyer Linda Icenhauer-Ramirez was appointed to represent Henderson on the 23 January state kidnapping charges. That same day, a Travis County grand jury issued a subpoena *duces tecum* for Byington to appear with any maps in her possession. She refused, claiming attorney-client privilege. A warrant was issued for her arrest, as well as a search warrant for her automobile and house. The arrest warrant was soon withdrawn. Authorities executed the search warrant but did not find any maps.

Earlier, on 2 February, Henderson (who had waived extradition) had been returned to Texas, where she was placed in solitary confinement under a "firewatch" — a procedure whereby inmates monitor another inmate for safety reasons. During that firewatch, between 5 and 8 February, Henderson befriended inmate Bolivia Jackson and they communicated on numerous occasions (correspondence primarily and a few conversations). Jackson provided the correspondence to the correctional authorities and recounted the conversations. In these communications, Henderson gave conflicting statements concerning the child's location: on the one hand, she told Jackson that she could draw a map to where the child was dropped off in Missouri; on the other, that the child was with his

grandmother in Oklahoma.  These communications indicated the child was still alive, contrary to what Henderson had told the FBI a few days earlier.

On 7 February, after a grand jury issued another subpoena for any maps, the State moved to compel their production.  A hearing was held that same day on the motion (map hearing), at which Henderson's counsel, Icenhauer-Ramirez and Byington, as well as Byington's counsel, including Steve Brittain, were present, but Henderson was not.  The next day, 8 February, the  state court ruled:  an attorney-client relationship existed between Henderson and Byington; any maps were *not* privileged, however, because they were made with the intent to aid law enforcement; and Byington was to produce any in her possession.  She produced two that day.  Using them, authorities found the child's body that same day, 8 February.

Henderson was charged the next day, 9 February 1994, with capital child murder.  On 22 April 1994, she was indicted for that offense.

During extensive pre-trial hearings in 1994 and 1995, Henderson moved to suppress all evidence obtained from, *inter alia*, use of the maps.  The motion was denied.  Post-trial, the court prepared findings of fact and conclusions of law concerning that denial.  Among other things, they provided:  (1) Henderson "failed to meet [her] burden of proof at the [map] hearing ... [and was

5

thus] precluded from attempting to suppress any evidence ... resulting from the production of the maps by the introduction of additional evidence which was available to [Henderson] at the time of the hearing on the motion to compel"; (2) the maps were intended to aid law enforcement in finding the child and were not intended to be confidential; and (3) the Kansas City AFPD did not violate the attorney-client privilege during his conversations with law enforcement.

In May 1995, Henderson was found guilty of the capital murder of a child under age six, in violation of TEX. PENAL CODE ANN. § 19.03(a)(8). At the trial's penalty phase, the jury found no mitigating factors to warrant a life sentence. Henderson was sentenced to death on 30 May 1995.

On direct appeal, the Texas Court of Criminal Appeals (TCCA) affirmed. **Henderson v. State**, 962 S.W.2d 544, 563 (Tex. Crim. App. 1997) (en banc). After rehearing was denied in March 1998, new appellate counsel for Henderson (later serving, *inter alia*, as her appointed counsel for the instant appeal), attempted to have the mandate recalled. The attempt was based on *in-camera* comments made by the trial judge during the map hearing; counsel for the direct appeal had failed to include them in the record on appeal. (This omission is the basis for the ineffective-assistance-of-appellate-counsel claim at hand, addressed in part II.D. *infra*.) In July

1998, with one dissent, leave to withdraw the mandate was denied. *Henderson v. State*, 977 S.W.2d 605 (Tex. Crim. App. 1998).

Henderson next requested a writ of certiorari from the Supreme Court of the United States. It was denied. *Henderson v. Texas*, 525 U.S. 978 (1998).

Seeking state-habeas relief in 1998, Henderson raised 18 issues. Without holding an evidentiary hearing, the state-habeas trial court (the same judge who had presided at, *inter alia*, the map and suppression hearings and trial) recommended relief being denied. Relief was summarily denied by the TCCA. *Ex parte Henderson*, No. 49984-01 (Tex. Crim. App. 6 Mar. 2002) (per curiam) (unpublished).

Henderson raised 13 issues in her federal habeas application. Pursuant to the State's summary-judgment motion, each claim was denied. *Henderson v. Dretke*, No. A-02-CA-758-SS, slip op. at 6-8 (W.D. Tex. 31 Mar. 2004).

The district court, however, granted a COA for seven of the issues Henderson requested certified for appeal. *Henderson v. Dretke*, No. A-02-CA-758-SS (W.D. Tex. 15 July 2004) (unpublished COA order). In addition to the COA granted for the claimed ineffective assistance by appellate counsel on direct appeal, the court granted a COA because of its concerns that *Cobb's* application possibly permitted improper conduct by law enforcement officials.

7

On 27 January 2006, our court denied Henderson's COA request for four issues the district court had refused to certify. **Henderson v. Dretke**, 164 F. App'x 506 (5th Cir. 2006). In April, oral argument was held on the issues certified for appeal by the district court.[*]

## II.

In general, for "a habeas corpus appeal, we review the district court's findings of fact for clear error and review its conclusions of law de novo, applying the same standard of review to the state court's decision as the district court". **Martinez v. Johnson**, 255 F.3d 229, 237 (5th Cir. 2001) (quoting **Thompson v. Cain**, 161 F.3d 802, 805 (5th Cir. 1998)). Here, "[b]ecause the district court granted summary judgment to the State, this court must determine whether the record discloses any ... issues ... that would preclude summary judgment in the State's favor". **Id.**; see FED. R. CIV. P. 56; see also **Busby v. Dretke**, 359 F.3d 708, 713 (5th Cir. 2004) (reviewing a summary-judgment denial of habeas relief).

---

[*]Approximately two weeks before the 5 April 2006 oral argument, which had been set on 17 February 2006, Henderson, supported by appointed counsel, requested that new, uncompensated counsel be permitted to present oral argument (uncompensated counsel). The uncompensated counsel apparently had been assisting Henderson since the fall of 2005 on a successive-habeas application and volunteered to serve without compensation. On 29 March 2006, we ordered that appointed and uncompensated counsel could divide the argument, which they did.

8

Because Henderson filed her 28 U.S.C. § 2254 application after enactment of the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214 (1996) (AEDPA), AEDPA controls. *See*, *e.g.*, **Lindh v. Murphy**, 521 U.S. 320, 336 (1997). Pursuant to AEDPA, we may not grant relief on a claim adjudicated on its merits by the state court unless at least one of two scenarios occurs. 28 U.S.C. § 2254(d).

First, relief may not be granted "unless [that] adjudication ... resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States". 28 U.S.C. § 2254(d)(1)(2004); *see* **Busby**, 359 F.3d at 713. A state-court decision is "contrary to" federal law if it relies on legal principles in direct conflict with prior Supreme Court holdings, or if it reaches a different conclusion than that reached by the Court on materially indistinguishable facts. **Busby**, 359 F.3d at 713. On the other hand, an "unreasonable application" occurs where, although "the state court correctly identifies the governing legal principle ... [it] unreasonably applies it to the facts of the particular case". **Id.** (quoting **Bell v. Cone**, 535 U.S. 685, 694 (2002)). In this regard, "unreasonable" requires more than that the state court applied clearly established federal law in an erroneous or incorrect manner; instead, its application must be

9

*objectively unreasonable*. **Rompilla v. Beard**, 545 U.S. 374, 125 S. Ct. 2456, 2462 (2005).

The second basis for habeas relief is if the state-court adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in ... [that] proceeding". 28 U.S.C. § 2254(d)(2). The certified issues for appeal, however, primarily, if not totally, concern subpart (d)(1) ("contrary to, or ... unreasonable application of, clearly established Federal law").

For an AEDPA inquiry under subpart (d)(1) or (2), the state court's factual determinations are "presumed to be correct". **Id.** § 2254(e)(1); *see* **Busby**, 359 F.3d at 713. That presumption can be rebutted only by "clear and convincing evidence". 28 U.S.C. § 2254(e)(1).

Along this line, Henderson contests the presumption of correctness accorded the state-habeas affidavits and the state-habeas findings. She raised this challenge, however, for the first time in district court. As Henderson's appointed counsel acknowledged at oral argument here, in state court the affidavits were challenged or criticized only "obliquely". As we held in denying Henderson a COA, **Henderson**, 164 F. App'x at 517, this contention fails because Henderson failed to contest those affidavits and findings in state court.

10

The seven issues certified for appeal by the district court concern the Sixth Amendment, which states in relevant part: "In all criminal *prosecutions*, the accused shall ... have the Assistance of Counsel for his defence". U.S. CONST. amend. VI (emphasis added). Applicable to the States through the Fourteenth, the Sixth Amendment provides for the effective assistance of counsel. *E.g.*, **United States v. Molina-Uribe**, 429 F.3d 514, 518 (5th Cir. 2005), *cert. denied*, 126 S. Ct. 1616 (2006).

Four of the seven issues certified for appeal involve a claim of pre-trial ineffective assistance of counsel (IAC). Therefore, the issues can be reorganized into the following four claims: (1) violation of Henderson's Sixth Amendment rights by law enforcement tactics; (2) *pre-trial* IAC by the Kansas City AFPD and three of the lawyers present at the map hearing (Byington, Brittain, and Icenhauer-Ramirez); (3) violation, during the firewatch, of her Sixth Amendment rights, under **Massiah v. United States**, 377 U.S. 201, 206 (1964) ("hold[ing] that the petitioner was denied the basic protections of [the Sixth Amendment] guarantee when there was used against him at his trial evidence of his own incriminating words, which federal agents had deliberately [and surreptitiously] elicited from him after he had been indicted and in the absence of his counsel"); and (4) IAC for her direct appeal.

As noted, for all but the appellate IAC claim, a COA was granted based on **Cobb's** application *vel non*. **Henderson**, No. A-02-

11

CA-758-SS, slip op. at 4-5.  For the reasons that follow, the state-court decision was neither contrary to, nor an unreasonable application of, clearly established federal law (collectively, not unreasonable).

A.

The first certified issue in the district-court COA order is whether "Henderson's *Sixth Amendment rights* were violated when *state law enforcement officials* engaged in tactics that compromised the confidentiality of *Henderson's communications with her lawyer*". *Id.* at 2 (emphasis added). Those communications occurred in early February 1994.

In denying habeas relief for this claim, the district court held it was unexhausted and, thus, procedurally defaulted. Nonetheless, as it did for the pre-trial IAC and **Massiah** claims, the court granted a COA based on its alternate ruling involving **Cobb**.  As discussed more fully in part II.B *infra* (pre-trial IAC), the district court questioned the fairness of **Cobb's** application.

Exhaustion of a claim in state court is required by AEDPA for a federal court to consider the claim.  28 U.S.C. § 2254(b)(1)(A). At oral argument here, Henderson's appointed counsel conceded this claim had *not* been exhausted in state court.  Henderson also failed in district court to present a claimed basis to overcome this procedural bar. *E.g.*, **Morris v. Dretke**, 413 F.3d 484, 491-92 (5th Cir. 2005) (noting that such default may be overcome by

12

demonstrating cause and prejudice or that failure to consider the claim would result in a fundamental miscarriage of justice). Therefore, this unexhausted claim cannot be considered.

B.

The next certified issue in the COA order is whether Henderson received *pre-trial* IAC from: the Kansas City AFPD, for "reveal[ing] a privileged communication to law enforcement officials — that Henderson had drawn a map indicating the location of the victim's body"; Byington, who "also informed law enforcement officials Henderson had drawn a map of where the victim was buried"; Brittain, for failing to "adequately safeguard Henderson's rights when he attempted to plea bargain on behalf of Henderson"; and Icenhauer-Ramirez, who "did not adequately assist [Henderson] on the matter of the map". **Henderson**, No. A-02-CA-758-SS, slip op. at 2-3.

In earlier denying habeas relief on this IAC claim, the district court had held Henderson had *no* Sixth Amendment right to the effective assistance of counsel for capital murder until she was so charged. The events for which Henderson claims IAC occurred no later than the map hearing on 7 February 1994; the map was produced, and the child's body located, on 8 February; and murder proceedings were *not* initiated until the next day, 9 February. Relying on **Cobb**, which held an accused's Sixth Amendment right to counsel does *not* attach to crimes "factually related" to the crime

13

for which the defendant has been charged, 532 U.S. at 167-68, the district court rejected the IAC claim.

As discussed in part, *supra*, when faced subsequently with the lower COA standard, however, the district-court COA order stated the **Cobb** rule was "harsh" and could encourage "gamesmanship" by authorities: it could shield conduct claimed to be in relation to one charged offense that could assist in proving an anticipated new charge to be made after that conduct. **Henderson**, No. A-02-CA-758-SS, slip op. at 5. Accordingly, Henderson's appellate brief seizes on this comment, asserting that the kidnapping charge (brought in January 1994 after the child disappeared while in Henderson's care, but before his body was located on 8 February 1994) was merely a pretext that enabled authorities to obtain forensic evidence that would support the subsequent 9 February murder charge.

For this IAC claim, the state-habeas trial court entered findings of fact and conclusions of law, including that each of the four attorneys was *not* constitutionally ineffective. The TCCA adopted them in denying habeas relief. The adopted bases for its holding need not be addressed in deciding, under AEDPA, whether its decision was unreasonable. As explained below, Henderson had *no* Sixth Amendment right to counsel for the child-murder charge when, prior to that charge, each of these four attorneys acted on her behalf concerning the kidnapping charge. Therefore, the TCCA's habeas-relief denial is *not* unreasonable under AEDPA.

14

Unlike the Fifth Amendment right against self-incrimination, the Sixth Amendment right to counsel is offense-specific. *See* *McNeil v. Wisconsin*, 501 U.S. 171, 175-77 (1991). Consistent with the plain language of the Sixth Amendment ("Assistance of Counsel for ... defence" limited to "[i]n all criminal prosecutions", *see* *Cobb*, 532 U.S. at 173 n.3), its protections attach at arraignment or indictment for a particular offense, which "signals 'the initiation of adversary judicial proceedings'". *Michigan v. Jackson*, 475 U.S. 625, 629 (1986) (quoting *United States v. Gouveia*, 467 U.S. 180, 187 (1984)). Only when such proceedings are initiated has a government "committed itself to prosecute, and only then [have] the adverse positions of government and defendant ... solidified. It is then that a defendant finds himself faced with the prosecutorial forces of organized society". *Id.* (quoting *Gouveia*, 467 U.S. at 189). Accordingly, "the right to counsel granted by the Sixth ... Amendment[] means at least that a person is entitled to the help of a lawyer at or after the time that judicial proceedings have been initiated against him". *Maine v. Moulton*, 474 U.S. 159, 170 (1985) (quoting *Brewer v. Williams*, 430 U.S. 387, 398 (1977)).

"Incriminating statements pertaining to other crimes, as to which the Sixth Amendment right has not yet attached, are, of course, admissible at a trial of those offenses." *Id.* at 180 n.16. Along this line, the Supreme Court, in *Cobb*, clarified that its

15

"decision in **McNeil** ... meant what it said ... [:]  the Sixth Amendment right is 'offense specific'".  532 U.S. at 164.  The Court explained that several federal and state courts had incorrectly read into **McNeil's** offense-specific rule an exception for crimes "factually related" to the charged offense.  *Id.* at 168.  The decision reviewed in **Cobb** for that exception was, interestingly, from the TCCA, whose state-habeas decision in 2002 (post-**Cobb**) is under AEDPA review here.

No "parade of horribles" having resulted from other courts' *not* having broadened the offense-specific definition, the Court declined to create an exception to the offense-specific rule for "factually related" offenses.  *Id.* at 171.  In refusing to do so, the Court noted no evidence had been presented that such events had occurred, and observed that the claimed exception "fail[ed] to appreciate the significance of two critical considerations", *id.*:

> First, there can be no doubt that a suspect must be apprised of his rights against compulsory self-incrimination and to consult with an attorney before authorities may conduct custodial interrogation. *See* **Miranda v. Arizona**, 384 U.S. at 479; **Dickerson v. United States**, 530 U.S. 428, 435 (2000) (quoting **Miranda**). In the present case, police scrupulously followed **Miranda's** dictates when questioning [Cobb]. Second, it is critical to recognize that the Constitution does not negate society's interest in the ability of police to talk to witnesses and suspects, even those who have been charged with other offenses.

16

*Id.* at 171-72 (internal footnote omitted).  In conjunction with

*Miranda's* critical role, the Court noted it

> protect[s] a defendant's right to consult with counsel before talking to police.  Even though the Sixth Amendment right to counsel has not attached to uncharged offenses, defendants retain the ability under *Miranda* to refuse any police questioning, and, indeed, charged defendants presumably have met with counsel and have had the opportunity to discuss whether it is advisable to invoke those Fifth Amendment rights.  Thus, in all but the rarest of cases, the Court's decision today will have no impact whatsoever upon a defendant's ability to protect his Sixth Amendment right.

*Id.* at 171 n.2.

*Cobb* provided one context in which the Sixth Amendment right attaches for other offenses, holding:  "even if not formally charged, [they] would be considered the same offense under the *Blockburger* [*v. United States*, 284 U.S. 299 (1932) double-jeopardy] test".  *Id.* at 173.  This test requires deciding "whether each provision [under which the defendant is charged for committing the same act]  requires proof of a fact which the other does not".  *Id.* (quoting *Blockburger*, 284 U.S. at 304) (alteration to *Blockburger* in original).

Henderson was charged with kidnapping in late January 1994 (state charge on the 23rd; federal, the 25th); she was charged with capital child murder on 9 February.  Although Henderson is correct that she *could have been* charged with murder in the course of a kidnapping, under TEX. PENAL CODE ANN. § 19.03(a)(2), she was charged,

17

instead, with the murder of a child under age six, pursuant to Tᴇx. Pᴇɴᴀʟ Cᴏᴅᴇ Aɴɴ. § 19.03(a)(8).  Under the *Blockburger* test, each offense for which she was charged requires proof of a fact that the other does not.  The kidnapping charge requires that the child have been taken from his guardians, while the capital child-murder charge requires that the child have been killed.  Like the burglary and capital murder offenses in *Cobb*, the kidnapping and capital child-murder charges here constitute separate offenses under *Blockburger*.  *See Cobb*, 532 U.S. at 173.  Henderson does *not* claim otherwise.

Cobb (2001) postdates Henderson's conviction becoming final in 1998.  Pursuant to *Teague v. Lane*, 489 U.S. 288 (1989), a new rule of constitutional law shall *not* be applied retroactively to cases on collateral review unless one of two exceptions, *not* applicable here, are met.  *Id.* at 307-08.  (Neither *Cobb*, nor subsequent Court opinions, address whether *Cobb* was intended to have retroactive application.)  As *Teague* explains, a new rule is created either if "it breaks new ground or imposes a new obligation on the States or the Federal Government", or "if the result was not *dictated* by precedent existing at the time the defendant's conviction because final".  *Id.* at 301 (emphasis in original).

Henderson does *not* contend *Teague* bars the State from relying on *Cobb*.  For that reason, and because, as reflected in the above-

18

quoted language from *Teague*, that decision does *not* impose a barrier where a case merely explains or clarifies an earlier Supreme Court decision, we need not speculate *sua sponte* on any such issue. *Id.; cf. United States v. Lopez*, 248 F.3d 427, 432 (5th Cir.) (noting a decision may apply retroactively where it states "what conduct is, and *always has been*, criminalized" (internal quotation marks omitted) (emphasis in original)), *cert. denied*, 534 U.S. 898 (2001). As discussed, in *Cobb*, the Court expressed its holding as a clarification of *McNeil* (in 1991, prior to Henderson's conviction becoming final in 1998), which, as noted, some courts (including this circuit and the TCCA) had misinterpreted to create an exception for "factually related" or "inextricably intertwined" charges. *See Cobb*, 532 U.S. at 168; *United States v. Walker*, 148 F.3d 518, 529 (5th Cir. 1998) (explaining, pre-*Cobb*, that Sixth Amendment "protections cover [different] offenses" when they are "inextricably intertwined", defined as "whether the conduct leading to each offense is the same"). The Court made clear that, based on *its* existing precedent, as opposed to that of courts which strayed from its *McNeil* holding, the result in *Cobb* was *dictated by precedent*. *Cobb*, 532 U.S. at 168.

In essence, Henderson seeks an exception to *Cobb*, claiming her factual situation presents the "parade of horribles" that did not occur in *Cobb*. *See* 532 U.S. at 171. *Teague* arguably bars

19

Henderson's attempt to create a new-rule exception to *Cobb*. In any event, her factual situation would *not* fit in such a parade. For example, there is no claim she did not receive her *Miranda* warnings. Moreover, as noted *supra*, her pre-trial motion, subsequent to the map hearing, to suppress the evidence (maps) produced as a result of that hearing, was heard extensively and denied.

Following being charged with kidnapping, Henderson did *not* have a Sixth Amendment right to counsel for capital child murder when each of the attorneys acted on her behalf prior to her being so charged. Accordingly, she may not, for the pre-trial conduct at issue, claim IAC for that charge.

C.

The district court granted a COA for whether "Henderson's Sixth Amendment right to effective assistance of counsel was violated under the rule announced in *Massiah* ... when the police placed her under fire watch [in early February 1994, prior to the 9 February murder charge] in order to obtain incriminating statements from her". *Henderson*, No. A-02-CA-758-SS, slip op. at 3. As for the pre-trial IAC claim, the court granted a COA, however, because of its earlier-discussed concern that, although Henderson had *not* been charged with capital murder until post-firewatch, permitting, based on *Cobb*, what transpired during the firewatch would encourage "gamesmanship" by authorities. *Id.* at 5.

20

*Massiah* (1964) held a criminal defendant may not have "used against him at his trial evidence of his own incriminating words, which federal agents had deliberately [and surreptitiously] elicited from him after he had been indicted and in the absence of his counsel". 377 U.S. at 206. A *Massiah* violation has three elements: (1) the Sixth Amendment right to counsel has attached; (2) the individual seeking information from the defendant is a government agent acting without the defendant's counsel's being present; and (3) that agent "deliberately elicit[s]" incriminating statements from the defendant. *Id.*; *Creel v. Johnson*, 162 F.3d 385, 393 (5th Cir. 1998), *cert. denied*, 526 U.S. 1148 (1999). The relevant state-habeas trial court's findings and conclusions included finding Jackson did *not* act as an agent for the State in interacting with Henderson. The TCCA adopted those findings and conclusions in denying this claim.

As in *Cobb*, the Sixth Amendment right to counsel under *Massiah* is offense-specific; this right cannot be violated until Sixth Amendment protections attach. *Walker*, 148 F.3d at 528-29. Again, they do so at arraignment or indictment for a particular offense. *Michigan*, 475 U.S. at 629.

As discussed *supra*, Henderson's Sixth Amendment rights for capital child murder did not attach before 9 February, when formal criminal proceedings were initiated against her for that offense. All communications with Jackson took place earlier, between 5 and

21

8 February. Because Henderson's offense-specific Sixth Amendment right to counsel for capital child murder had not attached when she communicated with Jackson, no *Massiah* violation could occur. *See Massiah*, 377 U.S. at 206. Therefore, it is *not* necessary to consider the other elements required for a *Massiah* violation.

D.

"A criminal defendant has a constitutional right to receive effective assistance of counsel on direct appeal." *United States v. Phillips*, 210 F.3d 345, 348 (5th Cir. 2000). The final issue certified for appeal in the district-court COA order concerns the direct appeal to the TCCA: whether "Henderson's Sixth Amendment right to effective assistance of counsel was violated because she received constitutionally inadequate assistance from her appellate counsel". *Henderson*, No. A-02-CA-758-SS, slip op. at 3.

An IAC claim involves the very familiar two-prong requirement under *Strickland v. Washington*, 466 U.S. 668 (1984): deficient performance and resulting prejudice. *Id.* at 687. The IAC standards applied to trial counsel apply to appellate counsel as well. *See, e.g.*, *Busby*, 359 F.3d at 714 (applying *Strickland* test to appellate counsel's performance).

Of course, for our AEDPA review of a state-habeas denial of an IAC claim, we do *not* decide whether IAC has been established. That

22

is the role of the state court.  As our court has repeatedly explained,

> the test for [AEDPA] purposes is *not* whether [the petitioner made the showing required under **Strickland**].  Instead, the test is whether the state court's decision — that [the petitioner] did *not* make the **Strickland**-showing — was contrary to, or an unreasonable application of, the standards, provided by the clearly established federal law (**Strickland**), for succeeding on his [IAC] claim.

*Id.* at 717 (first alteration added; other alterations and emphasis in original) (quoting **Schaetzle v. Cockrell**, 343 F.3d 440, 444 (5th Cir. 2003)).  Accordingly, supporting evidence for the two-prong **Strickland** test is reviewed under the AEDPA lens in deciding whether the state-court decision satisfies AEDPA's reasonableness standard.

Therefore, in state court, for the first prong of the **Strickland** test, Henderson had to "demonstrate that [appellate] counsel's representation 'fell below an objective standard of reasonableness'".  **Soffar v. Dretke**, 368 F.3d 441, 472 (5th Cir. 2004) (quoting **Strickland**, 466 U.S. at 688).  Next, the prejudice prong required Henderson in state court to "establish a 'reasonable probability that, but for [appellate] counsel's unprofessional errors, the result of the proceeding would have been different'".  *Id.* at 478 (quoting **Strickland**, 466 U.S. at 694).  This required showing an error "sufficient to undermine confidence in the outcome".  **Strickland**, 466 U.S. at 694.  Under this prong for an

23

appellate IAC claim, "we must counter-factually determine the probable outcome on appeal had" the performance not been deficient. *United States v. Reinhart*, 357 F.3d 521, 530 (5th Cir. 2004) (internal quotation marks omitted).

Appellate IAC is usually claimed where counsel fails to raise a particular issue on appeal; in that context, "[a]ppellate counsel is not deficient for not raising every non-frivolous issue on appeal". *Id.* at 525. Where, as here, the habeas petitioner instead challenges appellate counsel's failure to provide an appellate court with the necessary parts of the record, we find less guidance. In *Goodwin v. Johnson*, 132 F.3d 162 (5th Cir. 1997) (reviewed under pre-AEDPA standards), the petitioner claimed IAC because of counsel's failure to include in the record on appeal the full transcript of a pretrial suppression hearing. *Id.* at 176. Our court disagreed, explaining that, even had the appellate court possessed the missing testimony, it would still be required to accept the trial court's credibility determinations. *Id.*

"The appellate process exists solely for the purpose of correcting errors that occurred at the trial court level." *Id.* at 174. Consequently, the right to effective counsel on appeal "'is recognized not for its own sake, but because of the effect that it has on the ability of the accused to receive a fair trial'". *Id.* (quoting *Lockhart v. Fretwell*, 506 U.S. 364, 369 (1993) (alteration to *Lockhart* in original)).

24

Henderson claims IAC because, in conducting her direct appeal, appellate counsel failed to notice a span of pages missing from the record, and thus failed to include them in the record on appeal for the TCCA. The missing pages contained an *in-camera* colloquy, during the 7 February 1994 map hearing, between the state trial judge and Henderson's counsel, Byington, in which the judge expressed his belief the child was dead.

As discussed *supra*, on 8 February 1994, the judge compelled production of any maps in Byington's possession on the basis that Henderson was represented by the attorneys present at the hearing and that, despite the attorney-client privilege, any maps were created to aid law enforcement. Henderson deems this missing portion of the record critical, claiming it would have shown the unreasonableness of any belief by law-enforcement officials that the child was still alive.

As also discussed *supra*, this was the basis for seeking unsuccessfully in 1998 to have the TCCA withdraw its mandate following its affirmance on direct appeal. This claim was next raised in the state-habeas application.

Accompanying the state's response to that application were several affidavits. Among them were two by Henderson's appellate counsel, in which he stated: he read the 44-volume record "more than once"; and he "did not see or know about the *in camera* colloquy between [the] Judge ... and Byington before [he] wrote

25

[his appellate] brief, and therefore did not use it on direct appeal". Both of these affidavits were found "true" by the state-habeas trial court, which "conclude[d] that [counsel's] representation of [Henderson] on appeal was competent". As noted, the TCCA adopted those findings and conclusions.

We need not address, through the AEDPA filter, the first of the two prongs for showing IAC: the state-court decision concerning whether counsel's failure to notice, or to supplement, this missing portion of the record constituted deficient performance. Instead, because Henderson had to satisfy both prongs in state court, we proceed to review that decision as it concerns the second, prejudice, prong. Pursuant to our restricted AEDPA review, the state-court decision on this IAC claim was not unreasonable because, in counter-factually determining the likely outcome, we conclude the TCCA on direct appeal would have reached the same conclusion had it possessed the missing transcript. *See Reinhart*, 357 F.3d at 530.

As the district court explained in denying Henderson habeas relief on this issue, "what mattered ... [for the direct] appeal was whether the [map-hearing] trial judge believed the law enforcement officers when they said they thought there was a chance [the child] was still alive, *not* what the trial judge himself believed about whether [the child] was alive". *Henderson*, No. A-02-CA-758-SS, slip op. at 28 (emphasis added). Indeed, on direct

26

appeal, the TCCA emphasized the importance of the law-enforcement authorities' belief, despite considerable evidence to the contrary: "At the time the trial court compelled production of the maps, authorities had reason to believe that the baby might still be alive". *Henderson*, 962 S.W.2d at 557. For example, during the firewatch shortly before the map hearing, Henderson communicated to Jackson that the child was still alive. Although the TCCA, on direct appeal, did not have the judge's *in-camera* statement before it, its subsequent discussion during state-habeas proceedings of the conflicting information provided by Henderson acknowledged what the TCCA ruled on direct appeal. For that direct appeal, it stated: it was likely a "remote possibility" that the child remained alive; authorities, nonetheless, "were entitled to pursue that remote possibility". *Id*. Under AEDPA, the state-habeas denial of this claim was not unreasonable.

### III.

For the foregoing reasons, the denial of habeas relief is

*AFFIRMED*.

27