# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 17-70008

United States Court of Appeals
Fifth Circuit

**FILED**

February 18, 2019

Lyle W. Cayce
Clerk

CHARLES VICTOR THOMPSON,

> Petitioner - Appellant

v.

LORIE DAVIS, DIRECTOR, TEXAS DEPARTMENT OF CRIMINAL
JUSTICE, CORRECTIONAL INSTITUTIONS DIVISION,

> Respondent - Appellee

---

Appeal from the United States District Court
for the Southern District of Texas

---

Before HIGGINBOTHAM, HAYNES, and GRAVES, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

Charles Victor Thompson was convicted by a Texas jury of capital murder and sentenced to death. After direct appeal and collateral review in state court, he petitioned the federal district court for a writ of habeas corpus, challenging the constitutionality of his conviction and sentence. The district court denied relief. Thompson now seeks a certificate of appealability (COA). We grant a COA on Thompson's second claim concerning the testimony of a state witness during his retrial on punishment. We otherwise deny his application for COAs on all other claims and affirm the district court's denial of an evidentiary hearing.

No. 17-70008

## I.

In the early hours of April 30, 1998, responding to a call, police arrived at the apartment of Glenda Dennise Hayslip to find Hayslip's boyfriend, Darren Cain, arguing with Thompson, Hayslip's ex-boyfriend.[1] After calming the situation, the police let Thompson leave the scene.[2] Three hours later, however, Thompson returned with a gun. After kicking down the door to the apartment, Thompson confronted Cain and shot him four times in the neck and chest, killing him. Thompson then turned to Hayslip. After reloading the gun, he told Hayslip "I can shoot you too, bitch," and fired into her cheek.[3] The bullet passed through Hayslip's face, blowing the dentures out of her mouth and nearly severing her tongue.[4] Thompson left the apartment, threw the gun into a creek, and went to the house of a friend, Diane Zernia, where he fell asleep.[5]

Hayslip was alive, but bleeding profusely, and sought help from neighbors.[6] Emergency responders arrived at the apartment and airlifted Hayslip to a hospital. During surgery, doctors were unable to secure an airway for Hayslip's breathing, and, while they were preparing for emergency surgery, she fell into a coma.[7] A few days later, Hayslip's family took her off of life

---

[1] *Thompson v. State*, No. AP-73,431, 2007 WL 3208755, at *1 (Tex. Crim. App. Oct. 31, 2007).

[2] *Id.*

[3] *Thompson v. State*, 93 S.W.3d 16, 19–20 (Tex. Crim. App. 2001).

[4] *Id.* at 20.

[5] *Id.* at 19.

[6] *Id.*

[7] *Id.* at 20.

support, and she died.[8] Hayslip's autopsy report describes her cause of death as a gunshot wound to the face.

Awaking later in the morning, Thompson described the shootings to Zernia, including how he had disposed of the murder weapon.[9] He then called his father, who brought him to the police station where he turned himself in.[10] The State indicted Thompson for capital murder for intentionally or knowingly causing Cain and Hayslip's deaths. The state court appointed counsel on May 19, 1998.

Thompson was active during his pretrial detention at the Harris County Jail. A few days after the shooting, he called Zernia asking what she had told the police. Thompson called again a few weeks later, again seeking details on what Zernia had told investigators, and clarifying that she was the only witness who could link him to Cain and Hayslip's murders. During this second call, Thompson asked Zernia for her home address, purportedly so that his attorney "could send her some documents and talk with her." Weeks later, Zernia told investigators that she "ha[d] not heard from his attorney as of yet."

During the same period, Thompson also discussed his case with fellow inmates Jack Reid and Max Humphrey, contemplating Zernia's status as a potential state witness and looking to arrange for her death.[11] According to Reid, Thompson engaged Humphrey, an Aryan Brotherhood gang member, to murder Zernia after his release on June 30th. Thompson also arranged retrieval of the murder weapon for delivery to Humphrey, to be used to

---

[8] *Id.*

[9] *Id.*

[10] *Id.*

[11] *Id.* at 22.

dispatch Zernia.[12] Thompson drew a map of the weapon's location, and asked Reid to pass the information to a contact outside the Jail for retrieval of the weapon.

Reid instead relayed the information to the police,[13] who attempted to recover the weapon. But their divers were unable to locate it. Although Thompson's right to counsel had attached, officers instructed the informant Reid to tell Thompson his contact had been unable to find the weapon, and would visit for better directions.[14] Posing as Reid's outside contact, Investigator Gary Johnson visited Thompson at the Jail, wearing a wire to record their conversation.[15] Thompson told Johnson he believed Humphrey had betrayed him, and offered Johnson $1,500 to retrieve the weapon and murder Zernia.[16] During the meeting, Thompson pressed a hand-drawn map against the glass of the visitor's booth, one similar to the map the police already held, depicting the weapon's location, as well as Zernia's address. Thompson then described Zernia's husband, daughter, her home and vehicles, and discussed the best times to carry out the murder.[17]

Relying on the recording of Johnson's meeting, the district attorney charged Thompson with solicitation of capital murder. Police visited Thompson in his cell and notified him of the charge; they searched his cell but were unable to recover the map displayed to Johnson. Police also apprehended Humphrey, who corroborated Reid's account of the murder arrangement, but denied that

---

[12] *Id.*

[13] *Id.*

[14] *Id.*

[15] *Id.* at 22–23.

[16] *Id.* at 23.

[17] *Id.*

he agreed to carry out the hit on Zernia. The police recovered the murder weapon on July 18, 1998 in Cypress Creek.

Undeterred by the solicitation charge, on August 21, 1998, Thompson spoke with another inmate, Robin Rhodes, again seeking help in persuading "some people not to [come] or be able not to come" to testify at his trial.[18] Thompson provided a list of names including Zernia's,[19] advising that Rhodes "either kill them or persuade them not to be there." Rhodes, it turned out, was a long time police informant. He gave the list to the police and expressed his willingness to testify against Thompson.[20]

Thompson was tried for capital murder in 1999. The guilt stage of the trial centered on Hayslip's injuries, and whether Thompson's shooting—as opposed to medical malpractice—caused her death. Thompson called an expert witness, Dr. Pat Radalat, who initially testified Hayslip would have survived the gunshot had she received proper medical care. Radalat opined that Hayslip's medical team failed to correctly place a nasotracheal tube, and then failed to monitor Hayslip's breathing while preparing for surgery, allowing her to experience bradycardia, a condition in which the heart slows due to low oxygen. On cross examination, however, Radalat backtracked, conceding Hayslip would have died in the absence of medical intervention. The State introduced the murder weapon and called a firearms expert to explain that, given the weapon's capacity and the number of shots fired, Thompson must have reloaded during the shooting.[21] The State also introduced the autopsy

---

[18] *Thompson v. Stephens*, 2014 WL 2765666, at *1 (S.D. Tex. June 18, 2014).

[19] *Id.*

[20] *Id.*

[21] *Thompson*, 93 S.W.3d at 20.

report certified by Dr. Paul Shrode, describing Hayslip's cause of death as a gunshot wound to the face. The jury found Thompson guilty of capital murder.[22]

During the punishment phase of the trial, the State introduced Johnson's recording of his jailhouse meeting with Thompson, and Johnson himself took the stand.[23] Based on the jury's answers to the questions regarding punishment—whether Thompson would be a future danger to society and whether there were sufficient circumstances mitigating against a death sentence—the court imposed the death penalty.[24]

In 2001, on direct appeal, the Texas Court of Criminal Appeals affirmed Thompson's conviction,[25] but found the punishment phase of the trial tainted by the admission of Johnson's testimony, solicited after Thompson's right to counsel had attached, in violation of the Sixth Amendment.[26] It vacated and remanded for a retrial on punishment.[27] The court also denied Thompson's pro se motion for rehearing, which argued the entirety of his trial was tainted by the Sixth Amendment violation and that his conviction should be vacated and remanded for retrial.[28]

In 2005, Thompson's case returned to the trial court for a retrial on punishment before a new jury.[29] During a pre-trial hearing, the State disclosed

---

[22] *Id.* at 18.

[23] *Id.* at 23.

[24] *Thompson*, 2007 WL 3208755, at *1.

[25] *Thompson*, 93 S.W.3d at 29.

[26] *Id.*

[27] *Id.*

[28] *Thompson v. State*, 108 S.W.3d 269, 270 (Tex. Crim. App. 2003).

[29] Thompson's application makes no claim of error that the retrial on punishment was impermissibly presented to a new jury different than that which decided guilt. *See Powell v.*

that it would call Robin Rhodes to testify, and that the prosecution had reached an agreement with Rhodes involving dismissal of outstanding "hot check cases" and a misdemeanor in exchange for his testimony. Four days before the start of testimony, however, Thompson's counsel overheard a conversation disclosing Rhodes's extensive history as an informant for the State. The trial court ordered the prosecution to turn over all information required under *Brady v. Maryland* by 5 p.m. the day before testimony was to begin, and denied Thompson's request for a continuance. The State committed on the record to "mak[ing] sure [Thompson's] counsel has everything."

On retrial, the State presented evidence of Thompson's past criminality, beginning in his childhood.[30] The State called Rhodes, who recounted his jailhouse discussions with Thompson. On cross examination, Rhodes explained that he had a longstanding working relationship with the State and had previously served as a paid informant. The trial court denied Thompson's motion to strike Rhodes's testimony. The jury answered the two-part inquiry on punishment as before, and the court again imposed the death penalty.[31] In 2007, on direct appeal of the retrial, the Texas Court of Criminal Appeals affirmed.[32]

Thompson had originally filed a state habeas petition in 2000 following his first trial presenting seventeen grounds for relief, and amended this application in 2007 following the retrial on punishment to raise fourteen

---

*Quarterman*, 536 F.3d 325, 334 (5th Cir. 2008) (holding that "no clearly established law decided by the Supreme Court" requires "the same jury to determine guilt and punishment").

[30] *Thompson*, 2007 WL 3208755, at *2.

[31] *Id.* at *1.

[32] *Id.* at *6.

grounds.[33] In 2013, the state trial court entered findings of fact and conclusions of law recommending denial of all relief.[34] In April 2013, the Texas Court of Criminal Appeals adopted the trial court's findings and conclusions, denying relief.[35]

Thompson first filed a habeas petition with the federal district court in 2014, fifteen years after his conviction. During this same period, Rhodes's counsel submitted a Public Information Act request to the Harris County District Attorney's office for information related to Robin Rhodes. The State's responsive disclosures indicated that Rhodes went by several pseudonyms in his transactions with the State, and that there was a signed contract from 1993 between Rhodes and Assistant District Attorney Joan Huffman. Citing these new sources—undisclosed in the state trial court—Thompson moved unopposed in federal court for limited discovery from Harris County, the Houston Police Department and the City of Baytown regarding Rhodes's status as an informant. The district court granted the motion, and also ordered the District Attorney's office to produce its files relating to Rhodes for *in camera* review. Thompson moved to stay and abet proceedings while the state habeas court resolved a third application for post-conviction relief, and the district court granted the stay. After the Texas Court of Criminal Appeals dismissed Thompson's third application as an abuse of the writ in March 2016, Thompson filed an amended petition with the federal district court raising fourteen grounds for relief, and requested an evidentiary hearing. On March 23, 2017,

---

[33] *Ex Parte Thompson*, No. WR-78,135-01, 2013 WL 1655676 (Tex. Crim. App. Apr. 17, 2013).

[34] *Id.*

[35] *Id.*

No. 17-70008

the district court denied Thompson relief on all claims and denied the motion for a hearing. This application followed.

## II.

We have jurisdiction over the district court's final decision denying post-conviction relief and a hearing under 28 U.S.C. § 1291 and 28 U.S.C. § 2253(a).

A state prisoner does not have "an absolute right to appeal" from a federal district court decision denying a petition for a writ of habeas corpus.[36] Instead, the prisoner must obtain a COA.[37] We issue a COA upon a "substantial showing of the denial of a constitutional right"[38]—that "jurists of reason could disagree with the district court's resolution of [the applicant's] constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further."[39] This determination is a threshold inquiry, not a full-fledged merits analysis.[40] Any doubts as to whether a COA should issue must be resolved in the applicant's favor.[41]

Thompson's petition is "also subject to the deferential standards of AEDPA."[42] Where Thompson seeks a COA on claims denied on the merits by the state habeas court, he must show that the state court's decision was "contrary to" or "involved an unreasonable application of" clearly established federal law, or that it "was based on an unreasonable determination of the

---

[36] *Buck v. Davis*, 137 S. Ct. 759, 773 (2017).

[37] 28 U.S.C. § 2253(c); *Miller–El v. Cockrell*, 537 U.S. 322, 335 (2003).

[38] 28 U.S.C. § 2253(c)(2).

[39] *Buck*, 137 S. Ct. at 773 (quoting *Miller-El*, 537 U.S. at 327).

[40] *See id.* at 773–74.

[41] *Young v. Davis*, 835 F.3d 520, 523–24 (5th Cir. 2016).

[42] *Charles v. Stephens*, 736 F.3d 380, 387 (5th Cir. 2013) (per curiam).

facts" given the record before the state court.[43] Where Thompson seeks a COA on claims that the state court deemed procedurally defaulted, he must show cause to excuse his failure to comply with the state procedural rule, as well as actual prejudice resulting from the alleged constitutional violation.[44]

## A.

Thompson first seeks a COA arguing that the guilt phase of his trial was tainted by the State's introduction of the murder weapon in violation of right to counsel. *Massiah v. United States* held that the Government violated a criminal defendant's Sixth Amendment right to counsel "when there was used against him at his trial evidence of his own incriminating words, which federal agents had deliberately elicited from him after he had been indicted and in the absence of his counsel."[45] The rule from *Massiah* applies not only to interrogation by identified officials, but also to "indirect and surreptitious" meetings during which the indicted individual may not "even know that he was under interrogation by a government agent."[46] Where state actors have obtained incriminating statements in violation of individual's right to counsel, "the defendant's own incriminating statements, obtained by federal agents under the circumstances here disclosed, could not constitutionally be used by the prosecution as evidence against him at his trial."[47] To bring a *Massiah* claim, the claimant must establish that his Sixth Amendment right to counsel

---

[43] *Harrington v. Richter*, 562 U.S. 86, 100 (2011) (quoting 28 U.S.C. § 2254(d)(1)–(2)).

[44] *Davila v. Davis*, 137 S. Ct. 2058, 2064–65 (2017) ("A state prisoner may overcome the prohibition on reviewing procedurally defaulted claims if he can show cause to excuse his failure to comply with the state procedural rule and actual prejudice resulting from the alleged constitutional violation." (internal quotation marks omitted)).

[45] 377 U.S. 201, 206 (1964).

[46] *Id.*

[47] *Id.* at 207.

had attached when a government agent sought information from the defendant without his counsel's presence, and deliberately elicited incriminating statements from the defendant.[48] *Massiah* claims are subject to harmless error analysis.[49]

At the outset, Thompson argues the district court erred in treating the issue as resolved by the Texas Court of Criminal Appeals and thus entitled to AEDPA deference. Jurists of reason would not debate the district court's granting of deference to the Court of Criminal Appeals' opinion on this issue. When Thompson raised the issue on direct appeal, the Court of Criminal Appeals granted a retrial on punishment, but, without stating its reasons, denied retrial on guilt. "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary."[50] We presume that the state court adjudicated the claim on the merits, and Thompson has presented no indication or state-law procedural principles to overcome that presumption. Jurists of reasons would not debate the district court's application of AEDPA deference to this claim.

Thompson's argument hinges on the assertion that "the police only recovered the gun based on statements illegally obtained." Given the deferential AEDPA review standards, jurists of reason would not debate the state court's denial of relief in light of the lack of factual support for this

---

[48] *United States v. Bates*, 850 F.3d 807, 810 (5th Cir. 2017).

[49] *Arizona v. Fulminante*, 499 U.S. 279, 307 (1991); *Satterwhite v. Texas*, 486 U.S. 249, 257 (1988) ("We have permitted harmless error analysis in both capital and noncapital cases where the evil caused by a Sixth Amendment violation is limited to the erroneous admission of particular evidence at trial.").

[50] *Richter*, 562 U.S. at 99.

contention. There is only a tenuous inference drawn from the timing of the meeting and discovery of the weapon: that police recovered the weapon two weeks after the meeting with Johnson does not attribute the gun's discovery to the meeting. According to the State, information regarding the gun conveyed during Johnson's jailhouse meeting was duplicative of the police's existing knowledge, namely the hand-drawn map provided to Reid and Zernia's account of Thompson's confession. Thompson does not dispute these contentions.

Moreover, even if the murder weapon was recovered based on Johnson's meeting, jurists of reason would not debate the harmlessness of its introduction during the guilt phase of Thompson's trial.[51] The murder weapon was introduced during testimony of a firearms expert, who explained that Thompson had reloaded during the shooting.[52] Thompson argues that but for the *Massiah* violation, the State would have introduced no evidence of reloading, vitiating its showing that Thompson intentionally killed Hayslip. This is farfetched. Taken together with the evidence properly before the jury—not least facts showing Thompson shot Zernia in the face and left her drowning in her own blood and suffocating on the swollen remnants of her severed tongue—the introduction of the murder weapon was not crucially important, let alone dispositive. The district court thus found that the state habeas court was not unreasonable to reject this claim. We agree that jurists of reason could not debate this conclusion, and that the claim does not deserve encouragement to proceed further. We deny a COA on this claim.

\

---

[51] *Milton v. Wainwright*, 407 U.S. 371, 377–78 (1972) ("[W]e do not close our eyes to the reality of overwhelming evidence of guilt fairly established in the state court years ago by use of evidence not challenged here; the use of the additional evidence challenged in this proceeding and arguably open to challenge was, beyond reasonable doubt, harmless.").

[52] *Thompson*, 93 S.W.3d at 20.

No. 17-70008

## B.

Second, Thompson seeks a COA arguing the State violated his rights to due process and counsel when it introduced the testimony of fellow inmate Robin Rhodes during the retrial on punishment. Though these claims were procedurally defaulted, Thompson argues he overcomes the procedural bar. Thompson also appeals the district court's denial of an evidentiary hearing on the Rhodes-related claims, which we review for an abuse of discretion.[53]

A *Brady* violation can provide cause and prejudice to overcome a procedural bar on a habeas claim.[54] Under *Brady*, a defendant is denied due process where the State fails to disclose evidence favorable to the accused and that evidence is material, meaning there is a reasonable probability that, had the evidence been disclosed, the outcome of the trial would be different.[55] To determine whether an informant was a government agent for purposes of a *Massiah* claim, the court asks whether the informant was promised, reasonably led to believe, or actually received a benefit in exchange for soliciting information from the defendant; and whether he acted pursuant to instructions from the State, or otherwise submitted to the State's control.[56]

## 1.

Thompson raised this claim in his third state habeas petition, which the Court of Criminal Appeals dismissed as an abuse of the writ.[57] The district court found the claim procedurally defaulted. Thompson argues, however, that the State's *Brady* violation in failing to disclose the full nature of Rhodes's

---

[53] *Hall v. Quarterman*, 534 F.3d 365, 367 (5th Cir. 2008).

[54] *Banks v. Dretke,* 540 U.S. 668, 691 (2004).

[55] *Id.*

[56] *Creel v. Johnson*, 162 F.3d 385, 393 (5th Cir. 1998).

[57] *Ex Parte Thompson*, No. WR-78,135-03, 2016 WL 922131, at *1 (Tex. Crim. App. Mar. 9, 2016).

13

relationship with the State until 2014 provides cause and prejudice, allowing him to overcome the procedural bar.

Days before his 2005 retrial on punishment, Thompson's trial counsel overheard a conversation suggesting Rhodes had previously worked as an informant. Thompson then probed Rhodes's relationship with the State during the retrial: specifically, during his cross examination, Rhodes self-described as a "full time informant" for the State at the time of his encounter with Thompson. The meaning of this description is not self-evident. While during the same testimony Rhodes explained that he had not solicited Thompson on the instructions of any state official, this does not preclude the possibility of more general open-ended instruction or guidance from his government "handler," nor even the possibility that Rhodes was performing general information-gathering duties. Thompson learned further that Rhodes not only served repeatedly as an informant for the State—in some cases paid tens of thousands of dollars for his services—but was even at some point an employee of the Harris County Organized Crime Task Force.[58] Aspects of Rhodes's history with the State were discoverable in public records, specifically the Texas Court of Appeals' published decision in *Stephens v. State*. That opinion describes Rhodes as an employee of the Organized Crime Task Force and "confidential informant in over 50 cases."[59] But that opinion does not necessarily describe the State's relationship with Rhodes exhaustively, particularly with respect to his status at the time he engaged Thompson in the Harris County Jail.

---

[58] *Thompson*, 2014 WL 2765666, at *2.

[59] 59 S.W.3d 377, 381–82 (Tex. App. 2001).

Thompson learned more of Rhodes's history with the State in mid-2014, after the Court of Criminal Appeals had denied post-conviction relief,[60] and he was before the district court. Pursuant to the district court's discovery order, the State produced a 1993 contract executed by Rhodes (under his pseudonym "Robert Lee"), his handler Floyd Winkler, and Harris County Assistant District Attorney Joan Huffman. Under the agreement, in exchange for dismissal of one theft charge and probation on another, Rhodes agreed to "cooperate with Officer Winkler . . . in the investigation of narcotics trafficking in the Harris County area of which he has knowledge," and to "follow the directions and instructions of Winkler or his fellow law enforcement officers." Thompson learned during retrial that Rhodes previously served as an informant. But the 1993 contract at least arguably clarifies the nature of his past work: Rhodes's duties to the State at times involved an open-ended information-gathering enterprise, in which the State would compensate Rhodes with without ex ante knowledge of the specific targets or subjects of his gathering. The agreement terminated in November 1993, and therefore does not cover the period during which Rhodes encountered Thompson in the Harris County Jail. But it does raise the possibility that, even if Rhodes had no specific instruction to solicit information from Thompson, he might have acted pursuant to a reasonable understanding that when he relayed the murder solicitation information to Winkler he would receive a benefit, such as payment or leniency on pending charges. Although the question is close,[61] jurists of reason could debate whether the State's delay in disclosing the 1993 contract suppressed material information regarding its history with Rhodes and caused Thompson's

---

[60] *Ex Parte Thompson*, 2013 WL 1655676, at \*1.

[61] *Young*, 835 F.3d at 523–24 (5th Cir. 2016) (any doubts as to whether a COA should issue must be resolved in the applicant's favor).

procedural default. Jurists of reason could also debate whether the introduction of Rhodes's testimony was a *Massiah* violation that prejudiced the retrial. Here, jurists of reason might debate whether on the basis of repeated transactions and the 1993 contract the State "reasonably led" Rhodes to believe that "benefits would follow" from a successful solicitation of useful information from Thompson.[62]

We therefore grant COAs on two questions arising from this claim: first, whether Thompson has established a *Brady* violation in the State's non-disclosure of its past relationship with Rhodes that would allow Thompson to overcome the procedural bar and entitle him to habeas relief; second, if the procedural bar is overcome, whether the introduction of Rhodes's testimony at the retrial on punishment constituted a *Massiah* violation under which Thompson is entitled to habeas relief.

**2.**

Thompson was unable to develop the facts underlying the Rhodes-related *Brady* and *Massiah* claims in state habeas court. When he got to federal district court, Thompson moved for limited discovery—which was granted—and then for an evidentiary hearing—which was not. Considering documents turned over by the State pursuant to its discovery order, including privileged documents reviewed *in camera*, the district court found an evidentiary hearing not "necessary to a full and fair adjudication of [Thompson's] claims." In so deciding, the district court downplayed the toll of time. By 2014, the Harris County Organized Crime Task Force, the government entity with which Rhodes had interacted, had dissolved, and Rhodes's handler Floyd Winkler no longer worked with the State. In response to the subpoena for Rhodes-related documents, the City of Baytown, which had taken possession of the Task

---

[62] *Creel*, 162 F.3d at 393.

No. 17-70008

Force's files, disclosed that relevant retention periods had expired, and it had destroyed relevant documents from that time. As a result, no records exist from the time to document the nature of Rhodes's relationship to the State in July and August 1998. For this reason, Thompson sought to question witnesses, specifically, Gary E. Patterson, Rhodes's attorney and intermediary with the Task Force; former Assistant District Attorney Joan Huffman, with whom Rhodes had executed the 1993 agreement; Rhodes's handler, Officer Floyd Winkler; Vic Wisner and Kelley Sigler, the prosecutors at Thompson's retrial; and Investigator Mike Kelley, who investigated Thompson's solicitation of murder in 1998. Thompson's factual development of these claims has been potentially hampered by the State's nine-year delay in disclosing key aspects of its history with Rhodes. As a result, the district court may not have been provided sufficient facts to make an informed decision as to the merits of the Rhodes-related claims.[63]

Even so, the district court did not err in denying Thompson an evidentiary hearing. Under 28 U.S.C. § 2254(e)(2), an applicant who has failed to develop the factual basis of a claim in the state habeas court may not obtain an evidentiary hearing in federal habeas proceedings unless two conditions are met. First, the petitioner's claim must rely on a new rule of constitutional law, or on a factual predicate that could not have been previously discovered through the exercise of due diligence.[64] Second, the facts underlying the claim must be "sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant

---

[63] *See McDonald v. Johnson*, 139 F.3d 1056, 1060 (5th Cir. 1998).

[64] 28 U.S.C. § 2254(e)(2)(A)(ii).

17

guilty of the underlying offense."[65] Here, the disputed factual predicate concerns potential error during Thompson's punishment retrial. Even if Thompson were to prevail on the claim, his guilty verdict would remain untouched. Under the statute, the district court did not have discretion to grant him a hearing. We affirm the district court's denial of the motion for an evidentiary hearing.

## C.

Third, Thompson seeks a COA arguing that the guilt phase of his trial was tainted by the State's failure to disclose that the Hayslip autopsy report was false and improperly certified by an incompetent, unqualified medical examiner. This claim was only raised in Thompson's third state habeas application, which the state habeas court deemed an abuse of the writ.[66] To overcome the procedural default, Thompson must establish cause and prejudice.[67]

Thompson argues that the State committed a *Brady* violation that allows him to overcome the procedural default. We need not proceed past the first *Brady* element. Thompson begins from the premise that the autopsy report mischaracterized Hayslip's cause of death, and that the medical examiner, Dr. Paul Shrode, and by imputation the State, knew this was so. In support, Thompson relies on the opinion of another expert, pathologist Dr. Lloyd White,

---

[65] *Id.* § 2254(e)(2)(B); *Oliver v. Quarterman*, 254 F. App'x 381, 390 n.6 (5th Cir. 2007) (unpublished) (noting in dicta "subsection (B) requires the habeas applicant to show that 'no reasonable factfinder would have found the applicant *guilty of the underlying offense*,' not that no reasonable factfinder would have imposed the same sentence." (emphasis in the original)); *see also In re Webster*, 605 F.3d 256, 258 (5th Cir. 2010) (holding that the plain meaning of similar language governing successive motions in 28 U.S.C. § 2255(h)(1) is limited to determinations of guilt, and not the petitioner's eligibility for a death sentence); *Hope v. United States*, 108 F.3d 119, 120 (7th Cir. 1997) (same).

[66] *Ex Parte Thompson*, 2016 WL 922131, at *1.

[67] *Davila*, 137 S. Ct. at 2064–65.

attributing Hayslip's death to "therapeutic misadventure" rather than to the shot she sustained. Assuming arguendo White is correct, an inaccurate report is not enough to sustain Thompson's claim. Rather Thompson must show that the State suppressed the inaccuracy. Here, Thompson resorts to speculation. He invokes instances in which the State medical examiner, Dr. Shrode lied. With this past, he insists Shrode "had to know" he was unqualified to certify the autopsy report. By imputation, the State "must have known" about Shrode's shortcomings as a medical examiner and inferred that the report was unreliable. These inferences are unsubstantiated. Perhaps medical professionals could debate which of the two opinions—White's or Shrode's—is more accurate. But Thompson has not established that jurists of reason could debate whether there was evidence of the State's suppression of exculpatory or impeaching facts. Additionally, Thompson assumes rather than establishing that the nondisclosure was material. He mentions that the jury specifically requested the autopsy report during its deliberations, and infers the report was dispositive in the verdict. Given the plethora of other evidence probative of Thompson's role in Hayslip's death—not least testimony from Dr. Radalat that the gunshot wound would have been fatal—he has not shown a basis for jurists of reason to debate whether he established a reasonable probability that more information on Shrode would have turned the verdict. We agree that jurists of reason could not debate the district court's conclusion that Thompson fails to establish cause and prejudice and does not overcome the procedural default. We deny a COA on this claim.

## D.

Fourth, Thompson seeks a COA arguing he received ineffective assistance of counsel during the guilt stage of his trial, describing five separate deficiencies. To prevail on such a claim, Thompson must establish that "counsel's representation fell below an objective standard of reasonableness"

and that the deficient representation caused prejudice, meaning "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."[68] Our scrutiny of counsel's performance is "highly deferential"[69]—"doubly" so when the ineffective-assistance claim is raised on federal review of a state-court decision rejecting the claim on the merits.[70] With these standards in mind, we must assess whether Thompson has established that jurists of reason would debate his ineffective assistance of counsel claims.

### 1.

Thompson argues his trial counsel provided ineffective assistance by failing thoroughly to question potential jurors about their reactions to his potential parole eligibility if sentenced to life imprisonment and about their likely reactions to victim-impact evidence. He also faulted trial counsel for failing to exercise preemptory strikes of jurors Harrell Rogers and Maria Blassingame. The state habeas court found that trial counsel acted "to select jurors that would give the defense the best possible chance at trial," and that "counsel strategically conducted voir dire, including the use of peremptory strikes, to achieve that goal." With some potential jurors, counsel did not ask about parole eligibility because the State had already touched on the subject. With respect to victim-impact evidence, no such evidence was presented during the guilt phase of the trial (the only phase subject to this claim) and so Thompson could show no prejudice. The decisions not to strike Rogers and Blassingame were "reasonable strategic decision[s]," taken considering their circumstances and attitudes relative to other potential jurors'.

---

[68] *Richter*, 562 U.S. at 104.

[69] *Id.*

[70] *See id.* at 105.

No. 17-70008

The district court did not find these conclusions unreasonable. With respect to the parole and victim-impact evidence questioning, the district court pointed out that these questions pertained to jurors' attitudes towards punishment—but the punishment phase of the first trial was overturned. Thompson cannot establish prejudice from the lack of such questions with respect to the guilt phase of his trial. Moreover, Thompson's reliance on trial counsel's statements that the ability to ask such questions was "necessary" for intelligent evaluation of potential jurors concerns trial counsel's thoughts on the *option* of pursuing such questioning, not his detailed views on questioning as applied to any particular potential juror. Viewing trial counsel's choices with the benefit of hindsight, the district court noted that Thompson might have provided reasons why another attorney might have questioned and exercised preemptory strikes. But the district court found it not unreasonable for the state habeas court to conclude that trial counsel's performance did not fall below the objective standard of reasonableness. We agree that jurists of reason could not debate this conclusion, and that this claim does not deserve encouragement to proceed further. We deny a COA on this claim.

**2.**

Thompson argues his trial counsel failed to object to a state witness's references to his prior bad acts—namely instances in which Thompson lost his temper and destroyed property at Hayslip's house. Under Texas law, evidence of these bad acts was admissible as probative of the previous relationship between the accused and the deceased. Thompson argues that because the State had not provided notice of these prior bad acts, they were clearly inadmissible under state law. This argument does not appear to have been

21

raised in the district court, and is waived.[71] Moreover, while we have suggested that a failure to object to prejudicial and clearly inadmissible evidence cannot be attributed to a strategic decision,[72] we are offered no plausible argument that the evidence of these violent outbursts was prejudicial to Thompson.[73] There was no shortage of other evidence indicating Thompson's violent relationship with Hayslip, not least evidence showing that Thompson shot Hayslip in the face and left her bleeding profusely. The state habeas court concluded that trial counsel's choice was sound because Thompson's hypothetical objection would have been meritless. The district court did not find this conclusion unreasonable. We agree that jurists of reason could not debate the district court's conclusion, and that the claim does not deserve encouragement to proceed further. We deny a COA on this claim.

**3.**

Thompson argues that his trial counsel failed to object to the prosecution's mischaracterization of Dr. Radalat's testimony. The parties agree on the substance of Radalat's testimony: he initially described Hayslip's wound as survivable, attributing her death to inadequate medical intervention, but later conceded on cross examination that Hayslip would have died in the absence of intervention. In its argument, the prosecution told the jury that Radalat "finally admitted to you that [Hayslip's] wounds would be fatal if left untreated." Thompson argues this statement mischaracterized Radalat's testimony, such that trial counsel's failure to object falls below the

---

[71] *Johnson v. Puckett*, 176 F.3d 809, 814 (5th Cir. 1999) ("[A] contention not raised by a habeas petitioner in the district court cannot be considered for the first time on appeal from that court's denial of habeas relief.").

[72] *Lyons v. McCotter*, 770 F. 2d 529, 534 (5th Cir. 1985).

[73] *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

No. 17-70008

objective standard of reasonableness. Thompson's trial counsel had broad discretion in choosing whether to object during closing arguments,[74] and decided not to object here—rightly so, because the objection would have had no merit. The prosecution's characterization was not inaccurate considering the totality of Radalat's testimony. The state habeas court concluded that trial counsel was not deficient in choosing not to object, because the prosecution had properly summarized Radalat's testimony and did not prejudice Thompson. The district court did not find this conclusion unreasonable. We agree jurists of reason could not debate the district court's conclusion, and that this claim does not deserve encouragement to proceed further. We deny a COA on this claim.

**4.**

Thompson argues that his trial counsel failed to request the inclusion of lesser included offenses with respect to Hayslip in the jury charge, even though Thompson had presented evidence suggesting he had not intended to shoot Hayslip. According to Thompson, the limited set of lesser included offenses narrowed the jury's options in the event jurors were determined to convict Thompson in some way for Hayslip's death, leaving a capital murder conviction as their only option. His argument is premised on possibility that jurors would have found that Hayslip's shooting was an accident—but the state court found that there was no evidence that could have supported such a conclusion. Trial counsel's decision as to which lesser included offenses to include in instructions is tactical, and the choice reached here was within the bounds of counsel's discretion. Once again, Thompson offers ex post evaluation of how these strategic decisions could have been better, but this cannot carry his claim. The state habeas court concluded that trial counsel was not deficient in not

---

[74] *Charles v. Thaler*, 629 F.3d 494, 502 (5th Cir. 2011).

23

No. 17-70008

requesting additional instructions, because the evidence did not support the submission of lesser-included offense instructions. The district court did not find this conclusion unreasonable. We agree jurists of reason could not debate this conclusion, and that this claim does not deserve encouragement to proceed further. We deny a COA on this claim.

**5.**

Thompson argues that his trial counsel failed to object to the admission of the murder weapon even though it was discovered as a result of Investigator Johnson's unlawful jailhouse interrogation. This claim does not appear to have been raised before the state habeas court, and therefore is procedurally defaulted. But even had it not faced the procedural bar, it would fail. We have already rejected Thompson's arguments attributing the recovery of the weapon to the Johnson meeting. Since that attribution is without merit, as the district court held, counsel's decision not to object on that basis was sound. We agree jurists of reason could not debate this conclusion, and that this claim does not deserve encouragement to proceed further. We deny a COA on this claim.

**E.**

Fifth, Thompson seeks a COA arguing the Texas capital murder scheme under which he was sentenced violates his rights under the Fifth, Sixth, and Fourteenth Amendments. In the punishment phase, the State has the burden to prove beyond a reasonable doubt that "there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society."[75] If the jury finds future dangerousness, the jury must then consider whether there are sufficient mitigating circumstances to

---

[75] TEX. CRIM. P. CODE §§ 37.071(2)(b)(1), 37.071(2)(c).

No. 17-70008

warrant a sentence of life imprisonment rather than a death sentence.[76] Unless the jury returns an affirmative answer to question one and a negative answer to question two, the court must sentence the defendant to life imprisonment.[77]

Thompson's challenge addresses the second question. He argues that the trial court's death sentence is impermissible where the jury does not find the absence of sufficient mitigating circumstances beyond a reasonable doubt. The state habeas court denied relief, finding that the Court of Criminal Appeals had already rejected the same argument. The district court did not find this conclusion unreasonable, agreeing that settled precedent foreclosed relief on the claim.

We agree jurists of reason could not debate the district court's conclusion, and that this claim does not deserve encouragement to proceed further. We have addressed similar constitutional challenges, concluding that they "ignore[] the distinction . . . between facts in aggravation of punishment and facts in mitigation."[78] As we have stated, "not asking the jury to find an absence of mitigating circumstances beyond a reasonable doubt is perfectly consistent with *Ring* and *Apprendi* because a finding of mitigating circumstances reduces a sentence from death, rather than increasing it to death."[79] Thompson concedes that this court has already answered the question, but argues that the situation has changed in light of the Supreme Court's 2016 decision in

---

[76] *Id.* § 37.071(2)(e)(1).

[77] *Id.* § 37.0712(g).

[78] *Blue v. Thaler*, 665 F.3d 647, 668 (5th Cir. 2011) (quoting *Apprendi v. New Jersey*, 530 U.S. 466, 490 n. 16 (2000)); *see also, Druery v. Thaler*, 647 F.3d 535, 546 (5th Cir. 2011) ("This court has held that '[n]o Supreme Court or Circuit precedent constitutionally requires that Texas's mitigation special issue be assigned a burden of proof.'" (quoting *Rowell v. Dretke*, 398 F.3d 370, 378 (5th Cir. 2005)).

[79] *Blue*, 665 F.3d at 669 (internal quotation marks omitted).

*Hurst v. Florida*.[80] *Hurst* addressed the constitutionality of Florida's capital punishment scheme in which the jury rendered an advisory verdict on sentencing, and then, considering this advice, a judge made the critical factual findings necessary to impose the death penalty.[81] The Court held that this procedure violated the Sixth Amendment, which requires that a jury—not a judge—make all findings that increase a defendant's punishment.[82] As the district court noted, the *Hurst* Court's holding does not bear on the Texas procedure, in which a jury reaches findings regarding whether to reduce a sentence from death.[83] We deny a COA on this claim.

## F.

Sixth, Thompson seeks a COA arguing the trial court's denial of his motion for a continuance before the start of the retrial on punishment violated his right to due process. The state habeas court found no error in the denials of Thompson's motions for continuance in connection with his retrial on punishment. It also rejected Thompson's premise that he was prejudiced by the lack of preparation time, and that his trial counsel failed to develop an adequate mitigation case as a result. The district court observed that "trial judges enjoy 'a great deal of latitude in scheduling trials['] and 'only an unreasoning and arbitrary insistence upon expeditiousness in the face of a justifiable request for delay' poses constitutional concern." Additionally, it agreed that Thompson had not shown that the denials of continuance resulted

---

[80] 136 S. Ct. 616 (2016).

[81] *Id.* at 620.

[82] *Id.* at 621–22.

[83] *See also Davila v. Davis*, 650 F. App'x 860, 873 (5th Cir. 2016) (unpublished), *aff'd*, 137 S. Ct. 2058 (2017) (addressing the same argument and concluding "[o]ur precedent precludes this claim. Reasonable jurists would not debate the district court's resolution, even after *Hurst*." (internal citation omitted)).

in prejudice: he could not cite specific evidence that "remained unpresented," nor demonstrate that trial counsel was in fact unprepared. The district court held it was not unreasonable for the state habeas court to conclude that there was no constitutional violation in the denials of continuance.

On remand for a retrial on punishment, the state trial court appointed Thompson's previous trial counsel, Ellis McCullough, as first chair, and in January 2005 appointed Terrence Gaiser second chair. In June, Thompson moved pro se to remove McCullough as appointed counsel; the trial court granted this motion on September 15, 2005. In that interval, Gaiser was active in Thompson's representation, including development of a mitigation case for the upcoming retrial on punishment. That retrial commenced on October 24, 2005. Thompson argues that Gaiser required more time to prepare because of the transition; he argues Gaiser discovered new information—new evidence pertaining to Thompson's treatments, closed head injuries, and documentation of substance abuse. Also, Gaiser had newly discovered a potential *Brady* violation in the State's plans to call Rhodes to testify. Without a continuance, he argues, Gaiser was unable adequately to prepare for the retrial in light of time lost after Hurricane Katrina.

Gaiser represented Thompson for almost ten months before the retrial, during which time he investigated and developed a mitigation case for his client. Thompson provides only conclusory assertions—no specific examples— in response to the state habeas court's question regarding specific evidence that went unpresented or specific instances in which Gaiser was in fact unprepared during the retrial. While Thompson is correct that denial of a continuance can violate a defendant's constitutional rights, the district court found the state habeas court was not unreasonable to conclude there was no violation in Thompson's case. We agree jurists of reason could not debate the

district court's determination, and that this claim does not deserve encouragement to proceed further. We deny a COA on this claim.

### III.

We GRANT a COA as to whether Thompson has established a *Brady* violation in the State's non-disclosure of a past relationship with Rhodes, sufficient to overcome the procedural default of Thompson's second claim; and, if so, whether Thompson is entitled to habeas relief on the grounds of the *Brady* violation or a *Massiah* violation in the introduction of Rhodes's testimony during the retrial on punishment. We otherwise DENY Thompson's application for COAs on all other claims and AFFIRM the district court's denial of an evidentiary hearing.