# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 17-70008

United States Court of Appeals
Fifth Circuit

**FILED**

October 29, 2019

Lyle W. Cayce
Clerk

CHARLES VICTOR THOMPSON,

Petitioner - Appellant

v.

LORIE DAVIS, DIRECTOR, TEXAS DEPARTMENT OF CRIMINAL
JUSTICE, CORRECTIONAL INSTITUTIONS DIVISION,

Respondent - Appellee

Appeal from the United States District Court
for the Southern District of Texas

Before HIGGINBOTHAM, HAYNES, and GRAVES, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

In 1999, Charles Victor Thompson was convicted of murdering Glenda Dennise Hayslip and Darren Cain and sentenced to death.[1] On direct review, the Texas Court of Criminal Appeals affirmed Thompson's conviction but ordered a retrial on punishment.[2] At the retrial, the State called Robin Rhodes, who testified that while the two men were detained together in the Harris

---

[1] *Thompson v. State*, 93 S.W.3d 16, 18–20 (Tex. Crim. App. 2001).

[2] *Id.* at 29. The court found that the State had violated Thompson's Sixth Amendment right to counsel by sending an undercover investigator, who later testified at the punishment phase of the trial, to meet with Thompson in jail and obtain information about Thompson's plot to have a witness murdered. The solicitation plot discussed in this opinion was a separate, subsequent effort involving a different intended hitman.

No. 17-70008

County Jail, Thompson had solicited him to murder a "hit list" of potential State witnesses.[3] Rhodes also testified that no one from the State had directed him to obtain information from Thompson; he simply saw an opportunity and seized it.[4]

On cross-examination, Rhodes explained that he had a longstanding working relationship with the State and had previously received large sums of money for his cooperation in other cases,[5] including up to $30,000 for his testimony in a prior capital murder trial.[6] In fact, Rhodes described himself as being a "full time informant" for the State at the time of his encounter with Thompson[7] and stated that he informed on "pretty much whatever situation [he] stumbled into." The jury also learned that Rhodes had testified in a 1999 drug case against his fiancée.[8] As part of his testimony in that case, Rhodes told the jury that he had worked for Harris County law enforcement "as a confidential informant in over 50 cases, more than 80 percent of which resulted in convictions; [and] that he had twice testified for the State, including once in a capital murder prosecution."[9]

The trial court denied Thompson's motion to strike Rhodes's testimony, and Thompson was again sentenced to death.[10] After his direct appeal and three state habeas petitions proved unsuccessful, Thompson sought federal habeas relief in 2014. Also in 2014, Thompson's counsel received the following items in response to a Public Information Act (PIA) request for information related to Robin Rhodes:

---

[3] *Thompson v. Stephens*, 2014 WL 2765666, at *1 (S.D. Tex. June 18, 2014).

[4] *Thompson v. Davis*, 916 F.3d 444, 456 (5th Cir. 2019).

[5] *Id.*

[6] *See Benavides v. State*, 992 S.W.2d 511 (Tex. App. 1999).

[7] *Thompson*, 916 F.3d at 456.

[8] *Stephens v. State*, 59 S.W.3d 377, 381 (Tex. App. 2001).

[9] *Id.*

[10] *Thompson v. State*, No. AP-73,431, 2007 WL 3208755, at *1 (Tex. Crim. App. Oct. 31, 2007).

1. A 1993 informant contract executed by Rhodes (under the pseudonym Robert Lee), his police handler Floyd Winkler, and Assistant District Attorney Joan Huffman. The contract, which began in August 1993 and was valid for three months, provided that the prosecutor would drop Rhodes's pending theft charge if Rhodes could provide information leading to drug arrests and seizures.

2. A 1997 *pro se* sentence-reduction motion in which Rhodes, then serving a two-year state prison term, stated that he "ha[d] cooperated in extensive narcotics investigations approximately (20) twenty [to] twenty-five (25) in number," which had led to numerous arrests and convictions. Rhodes also stated that he had been cooperating "with the Harris County Organized Crime Task Force since 1993."

3. A memorandum dated August 25, 1998 in which the DA's investigator Mike Kelly reported Rhodes's statement that he had spoken with Thompson about the solicitation plot and obtained Thompson's "hit list" on August 21.

4. A handwritten note from the prosecutor's file that appears to list Rhodes's contact information and a quote (presumably from Thompson, though unattributed) describing a woman who he "thought [was the] only witness" as a "bitch" who "had it coming." The second-to-last line of the note says: "contacted Floyd, get in hand." Presumably, "Floyd" is Rhodes's police handler, Officer Floyd Winkler. Thompson contends that this line demonstrates that Winkler "instructed Rhodes to get proof of Thompson's solicitation request."

5. Another handwritten note from the prosecutor's file outlining Thompson's interactions with Rhodes. In the left-hand margin near the top of the page is a partial date—"/13/98"—with the month missing. Thompson claims that the missing month was August, and that the note

therefore proves Rhodes was talking to authorities about the case before he ever interacted with Thompson.

6. A transcript of Rhodes's testimony in the *Stephens* case. In addition to the testimony described above, the transcript shows that Rhodes claimed that "approximately 80 percent of the cases that [he] participated in . . . resulted in arrest and conviction."

The district court denied Thompson relief on all fourteen of his claims and denied his motion for a hearing. This Court granted Thompson a certificate of appealability on his claim that the State violated his "rights to due process and counsel when it introduced the testimony of fellow inmate Robin Rhodes during the retrial on punishment."[11] Citing *Massiah v. United States*,[12] Thompson argues that Rhodes was acting on behalf of the State during their jailhouse conversations, and thus his testimony violated Thompson's Sixth Amendment right to counsel. Although the *Massiah* claim is procedurally defaulted, Thompson argues he can overcome the procedural bar by showing that the prosecution violated its *Brady*[13] obligations by concealing facts that, if known, would have led to the exclusion of Rhodes's testimony on *Massiah* grounds. And without Rhodes's testimony, Thompson claims, the jury likely would not have resentenced him to death.

Assuming only for the sake of argument that Thompson could prove the first two elements of a *Brady* violation—favorability and suppression[14]—he cannot show "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."[15] That is, Thompson cannot show that the PIA-request evidence would have led to the

---

[11] *Thompson*, 916 F.3d at 455.

[12] 377 U.S. 201 (1964).

[13] *See Brady v. Maryland*, 373 U.S. 83, 87 (1963).

[14] *See Strickler v. Greene*, 527 U.S. 263, 281–82 (1999).

[15] *United States v. Bagley*, 473 U.S. 667, 675 (1985); *see Banks v. Dretke*, 540 U.S. 668, 691 (2004).

exclusion of Rhodes's testimony on *Massiah* grounds, much less to a more favorable sentence. To establish a *Massiah* violation, a defendant must show: "(1) a Sixth Amendment right to counsel had attached; (2) an individual seeking the information was a government agent acting without the defendant's counsel being present; and (3) that the agent deliberately elicited incriminating statements from the defendant."[16]

It may be debatable whether Thompson's right to counsel had attached when he spoke to Rhodes, but it is plain that Rhodes was not acting as a government agent. To prove an agency relationship between the government and a jailhouse informant, a defendant must show that "the informant: (1) was promised, reasonably led to believe [that he would receive], or actually received a benefit in exchange for soliciting information from the defendant; *and* (2) acted pursuant to instructions from the State, or otherwise submitted to the State's control."[17] Thompson has not met his burden as to either element. To the contrary, the evidence supports the State's contention that "although Rhodes saw an opportunity to help himself if Thompson discussed the solicitation plot, he did not elicit information from Thompson at the behest of the State." After all, an informant cannot be an agent of the State without the State's knowledge or consent,[18] and there is no credible evidence that Rhodes had any contact with the State regarding Thompson until *after* he had discussed the solicitation plot with Thompson and obtained his hit list.

Of the six PIA items identified by Thompson, the sentence-reduction motion, Mike Kelly memorandum, and *Stephens* transcript are all cumulative of testimony presented to the jury at the retrial—namely, that Rhodes, a

---

[16] *United States v. Bates*, 850 F.3d 807, 810 (5th Cir. 2017) (citing *Henderson v. Quarterman*, 460 F.3d 654, 664 (5th Cir. 2006)).

[17] *Id.* (emphasis added) (quoting *Creel v. Johnson*, 162 F.3d 385, 393 (5th Cir. 1998)).

[18] *See Karl Rove & Co. v. Thornburgh*, 39 F.3d 1273, 1296 (5th Cir. 1994) ("As in the formation of any contract, the consent of both parties is necessary to establish an agency relationship.").

longtime, full-time informant who frequently testified in exchange for money, spoke with Thompson and obtained his hit list on August 21, 1998.[19] It is well established that "when the undisclosed evidence is merely cumulative of other evidence in the record, no *Brady* violation occurs."[20]

As for the rest of the evidence, the two handwritten notes from the prosecution's files do not support the inferences Thompson would have us draw from them. Thompson argues that the "get in hand" notation in the first note and the missing month in the second (which he asserts, without evidence, must be August) prove that Rhodes approached Thompson in jail at the request of Officer Winkler. These claims are speculative, and this Court has long recognized that it is "unwise to infer the existence of *Brady* material based upon speculation alone."[21] Likewise, although the informant contract does show that Rhodes worked with Officer Winkler as far back as 1993, the contract only lasted three months and its target was drug dealing, not the murder-solicitation plot Rhodes uncovered in this case. We cannot conclude that this contract indicates Rhodes was acting under Winkler's instructions when he spoke with Thompson in jail nearly five years after the contract's 90-day term had expired.

Finally, Rhodes's previous, short-term agency relationship with the DA, evidenced by the 1993 informant contract, does not turn him into a perpetual agent. As we stated in *United States v. Fields*, a jailhouse informant is not a government agent simply because he has "previously cooperated with the government" and decides to capitalize on "an opportunity to do so again" by eliciting incriminating information from a cellmate.[22] Moreover, the fact that

---

[19] *See Thompson*, 93 S.W.3d at 18; *Thompson*, 2014 WL 2765666, at *1.

[20] *United States v. Sipe*, 388 F.3d 471, 478 (5th Cir. 2004) (internal alterations omitted) (quoting *Spence v. Johnson*, 80 F.3d 989, 995 (5th Cir. 1996)).

[21] *United States v. Stanford*, 823 F.3d 814, 841 (5th Cir. 2016) (quoting *United States v. Williams-Davis*, 90 F.3d 490, 514 (D.C. Cir. 1996)).

[22] 761 F.3d 443, 478 (5th Cir. 2014).

No. 17-70008

Rhodes correctly expected, based on his past interactions with the State, "that he would receive a benefit for his testimony" does not make him a State agent. It is not enough for an informant to believe he will receive a benefit in exchange for his testimony; to be a government agent, he must be "*led* to believe" he will receive that benefit.[23]

In short, because Thompson has shown no evidence that the State controlled—or even consented to—Rhodes's informant activity, there is no valid *Massiah* claim that could have affected the outcome of the punishment retrial. Accordingly, we affirm the district court's denial of habeas relief.

---

[23] *Bates*, 850 F.3d at 810 (emphasis added) (quoting *Creel*, 162 F.3d at 393).